**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CYNTHIA BALL,

Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.,

Defendant.

Civil Action No.: 1:19-CV-10593

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Keya C. Denner, Esq.
Timothy M. Barbetta, Esq.
FORD HARRISON LLP
*Attorneys for Defendant*
300 Connell Drive, Suite 4100
Berkeley Heights, New Jersey 07922
Tel: (973) 646-7308
Fax: (973) 646-7301

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.   Marriott Has Appropriate Policies Prohibiting Discrimination, Harassment,
         Retaliation and Violence in the Workplace. ............................................................... 3

    B.   Plaintiff's Employment with Marriott. ...................................................................... 5

    C.   Plaintiff's Allegations of Harassment and the Hotel's Investigation and Response. .... 6

         i.   October 18, 2016 Incident ................................................................................ 6

         ii.   September 10, 2017 Incident. ........................................................................... 7

         iii.  September 18, 2017 Incident. ........................................................................... 8

         iv.  The Hotel Immediately Conducts an Investigation Which Confirms the Eye
              Witness's Statement that the Touching was Accidental. .................................... 10

    D.   Plaintiff's Late Application for the Bartender Position. ............................................. 15

    E.   Plaintiff Files an Administrative Claim Against Marriott, Followed by this Lawsuit. 17

LEGAL ARGUMENT ........................................................................................................ 18

    POINT I  SUMMARY JUDGMENT IS APPROPRIATE AS THERE IS NO GENUINE
         DISPUTE AS TO ANY MATERIAL FACT .................................................................. 18

    POINT II PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM FAILS AS A

    MATTER OF LAW ........................................................................................................ 18

    A.   Plaintiff's 2016 Allegations are Time Barred. ........................................................... 18

    B.   Plaintiff Cannot Establish a *Prima Facie* Case of Hostile Work Environment Under
         Title VII in Connection with the September 2017 Incidents. ....................................... 20

    1.   Plaintiff Was Not the Victim of Severe or Pervasive Workplace Hostility. .............. 21

         i.   September 10, 2017 Incident. ........................................................................... 21

         ii.   September 18, 2017 Incident. ........................................................................... 23

    2.   Plaintiff Cannot Establish a Basis for Imputing Liability to Marriott. ....................... 26

    POINT III   PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF FACT
         AND LAW ...................................................................................................................... 29

    A.   Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation Under Title VII. ......... 29

    B.   Assuming Arguendo Plaintiff Could Establish a Prima Facie Case of Retaliation,
         Defendant has Proffered a Legitimate, Non-Retaliatory Reason for Plaintiff Not
         Receiving the Position. ................................................................................................ 33

CONCLUSION ................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Yale New Haven Hosp.*, 558 F. App'x 72 (2d Cir. 2014)..............................................29

*Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002)......................................................................20

*Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4 (2d Cir. 2017) ..................................................20

*Anderson v. Davis Polk & Wardwell, LLP*, 850 F. Supp. 2d 392 (S.D.N.Y. 2012) ...................25

*Creacy v. BCBG Max Azria Grp., LLC*, No. 14 CIV. 10008 (ER), 2017 WL 1216580 (S.D.N.Y. Mar. 31, 2017)......................................................................................................................27

*Davis v. Peake*, No. 08-cv-3570, No. 08 CIV. 3570 KTD, 2011 WL 4407551 (S.D.N.Y. Sept. 20, 2011) ........................................................................................................................................31

*Dayes v. Pace Univ.*, No. 98 Civ. 3675 (WHP), 2000 WL 307382 (S.D.N.Y. Mar. 24, 2000), aff'd, 2 F. App'x 204 (2d Cir. 2001) ...........................................................................................22

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163 (2d Cir. 2014).......................................................18

*Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499 (S.D.N.Y. 2016).......................23

*Duch v. Jakubek*, 588 F.3d 757 (2d Cir. 2009) ...........................................................................26

*Duplan v. City of NY*, 888 F.3d 612 (2d Cir. 2018) ...................................................................21

*Encarnacion v. Isabella Geriatric Ctr., Inc.*, No. 1:11-cv-3757-GHW, 2014 WL 7008946 (S.D.N.Y. Dec. 12, 2014)............................................................................................................20

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004).............................................................21, 26

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994).......................34

*Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111 (2d Cir. 2000) .......................................31

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010) ................................................21

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993)................................................................................21

*Hawkes v. 1115 Legal Servs. Care*, 163 F.3d 684 (2d Cir. 1998) ..............................................19

*Henderson v. Sikorsky Aircraft Corp.*, 590 F. App'x 9 (2d Cir. 2015).........................................34

*Heyman v. Queens Vill. Comm. For Mental Health for Jamaica Cmty, Adolescent Program*, 198 F.3d 68 (2d Cir. 1999)...............................................................................................................30

*Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647 (2d Cir. 2011)........................................19

*Holohan v. Newmark & Co. Real Est., Inc.*, No. 18-CV-6275 (AJN), 2019 WL 4743883 (S.D.N.Y. Sept. 16, 2019)...........................................................................................................22

*Johnson v. Buffalo Police Dep't*, 46 F. App'x 11 (2d Cir. 2002) .................................................19

*Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006) .....................31

*Leifer v. N.Y. State Div. of Parole*, 391 F. App'x 32 (2d Cir. 2010) ..........................................33

*Lucas v. S. Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141 (E.D.N.Y. 1998).....................................22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .........................18

*McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70 (2d Cir. 2010)...........................................20, 25

*Ocasio v. Mohawk Valley Cmty. Coll.*, No. 620CV1355GTSATB, 2021 WL 4477241, (N.D.N.Y. Sept. 30, 2021) ..........................................................................................................................27

*Payne v. Cornell Univ.*, No. 18-CV-1442 (GTS/ML), 2021 WL 39684 (N.D.N.Y. Jan. 5, 2021)34

*Prince v. Cablevision Sys. Corp.*, No. 04 CIV.8151(RWS), 2005 WL 1060373 (S.D.N.Y. May 6, 2005) ..........................................................................................................................................25

*Ragin v. E. Rampapo Cent. Sch. Dist.*, No. 05 CIV. 6496 (PGG), 2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010), aff'd, 417 F. App'x 81 (2d Cir. 2011).................................................................30

*Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CIV. 4096 (SAS), 2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003) ...........................................................................................................................23

*Seivright v. Montefiore Med. Ctr.,* No. 11 CIV. 8934 AJN, 2014 WL 896744 (S.D.N.Y. Mar. 3, 2014) .......................................................................................................................... 31

*Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161 (2d Cir. 2006) ........................................ 30

*Soliman v. Deutsche Bank*, No. 03 CIV. 104 (CBM), 2004 WL 1124689 (S.D.N.Y. May 20, 2004) ........................................................................................................................... 26

*Spina v. Our Lady of Mercy Med. Ctr.*, No. 97 CIV.4661 RCC, 2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003), aff'd, 120 F. App'x 408 (2d Cir. 2005) ...................................... 26

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013) ................................................. 26, 27, 29

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) .................................... 30

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015)...................................... 30

*Welsh v. Rome Mem. Hosp., Inc.*, No. 614CV1423DNHATB, 2016 WL 6603216 (N.D.N.Y. Nov. 8, 2016) .................................................................................................................. 34

*Williams v. New York City Hous. Auth.*, 458 F.3d 67 (2d Cir. 2006) .......................................... 19

*Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552 (S.D.N.Y. 2005) ................................... 30

**Statutes**

Title VII of the Civil Rights Act of 1964 ...................................................................................... 1

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................... 18

## PRELIMINARY STATEMENT

Defendant Marriott International, Inc. ("Defendant," "Marriott," or the "Hotel") submits this Memorandum of Law in Support of its Motion for Summary Judgment along with its Local Rule 56.1 Statement of Material Facts ("56.1 Stm.") seeking summary judgment and dismissal with prejudice of the claims asserted by Plaintiff Cynthia Ball ("Plaintiff" or "Ball"). In Plaintiff's Complaint, she asserts claims for hostile work environment and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), premised on a September 2017 incident where a bar patron (not a Marriott employee or overnight guest) collided with her. In doing so, Plaintiff claims the patron "grabbed" her buttocks for "two or three" seconds and put his fingers up "between her buttocks." Based on the undisputed facts on this motion, however, Plaintiff's claims of hostile work environment and retaliation should be dismissed with prejudice.

First, Plaintiff cannot establish her hostile work environment claim because the evidence demonstrates the touching was accidental, and, therefore, the patron's conduct was not severe. The surveillance video of the incident (which is submitted herewith) clearly shows an unintentional collision, not a "sexual assault," as Plaintiff claimed at the time. The video also confirms Plaintiff *acted* like the collision was an accident – she has no physical reaction right after it happens, and does not alert the bartender or her supervisor in order to stop the man from leaving the bar. Plaintiff also admits that right after the incident, she began to second guess whether she was "making a big deal out of nothing," and over a year later (after she asserted claims against Defendant), she candidly admitted to friends that she still was not sure what happened ("Did I see what I thought I saw? Did I feel what I thought I felt? Did it happen at all? . . . but I'm no longer sure what I saw. . . . So what happened? Now I'm no longer sure . . .").

Even putting aside these serious questions about Plaintiff's own subjective belief as to the severity of the incident, the undisputed evidence shows there is no basis to impute liability upon

1

Marriot because it immediately investigated Plaintiff's allegations. Right after Plaintiff made a report, Hotel security took several written statements, including the statement of the bartender, Dominick Franzo. Mr. Franzo's written statement to Hotel security confirmed that the collision was unintentional and that the patron did not grab Plaintiff's buttocks from behind. In furtherance of its investigation, the Hotel also reviewed the surveillance video of the incident, which establishes Mr. Franzo is standing only a few feet away as the collision happens and he is looking and pointing at Plaintiff and the patron when the accident occurs.

The Hotel's immediate investigation, therefore, revealed the following: 1) Mr. Franzo, the only eyewitness to the incident, asserted that the collision was an accident; 2) the video confirmed Mr. Franzo saw the collision and corroborated his version of the events; and 3) the video did not establish that Plaintiff was intentionally grabbed or assaulted. Thus, despite Marriott's efforts to gather details about the patron and the incident to prevent future interactions, Marriott found no evidence to substantiate Plaintiff's allegations. Even so, Defendant worked with Plaintiff to allow her time off from work, and then met with Plaintiff and her union representative to view the video. Marriott also installed panic buttons at the bar to alleviate Plaintiff's concerns and for employees to quickly call security in case any incident warrants additional assistance. Moreover, Marriott's response has been effective: Plaintiff has admitted she has suffered no harassment on the job since the Hotel implemented these measures, nor is she aware of anyone else who has.

Plaintiff's retaliation claim fares no better than her hostile work environment claim. First, Marriott has taken no adverse action against Plaintiff for her complaint about the patron. Indeed, Plaintiff remains employed by Marriott and has not received any demotions or reductions in her pay. Rather, Plaintiff's retaliation claim is premised solely on her contention that she did not receive a bartender position approximately ten months after her September 2017 complaint. There

is simply no causal connection between Plaintiff's complaint and Marriott selecting another candidate for this position. The undisputed evidence shows the job was offered to the candidate who scored highest on the written bartender test, which was the determinative factor as to which candidate would be offered the job. Plaintiff also admits that a brand new management team took over prior to the selection of the new bartender, undercutting any argument that the decision not to hire her for the position was somehow punitive or retaliatory.

Accordingly, and as further discussed below, Marriott's Motion for Summary Judgment should be granted in its entirety.

## **FACTUAL BACKGROUND**

### A. **Marriott Has Appropriate Policies Prohibiting Discrimination, Harassment, Retaliation and Violence in the Workplace.**

At all relevant times, Marriott[1] has maintained a policy strictly prohibiting unlawful discrimination and harassment in the workplace. *See* Declaration of Miriam Ruiz ("Ruiz Decl."), ¶ 4. Marriott's policy against discrimination and harassment is distributed to all associates, and each associate acknowledges his or her review, understanding, and agreement to comply with the Company's policies. *Id.* Marriott includes copies of its anti-discrimination/anti-harassment policy in its Handbook distributed to every associate. *Id.* The policies provide that Marriott:

> insists that all associates be treated with dignity, respect and courtesy. [The Company] maintains a "zero tolerance" policy regarding discrimination, harassment or retaliation occurring in the workplace or in connection with work.

*Id.* at Ex. A.

In addition to unlawful action, Marriott "prohibit[s] conduct and comments which are not severe enough to violate state, federal, or local law but which are still inappropriate in our

---

[1] Marriott International, Inc. acquired Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") in September 2016. Prior to this time, the Westin New York at Times Square Hotel was a Starwood property. To the extent any of the documents and policies described herein are ascribed to Starwood or describe Starwood policies, these apply to Defendant and will be referred to as Marriott documents and/or policies for ease of reference.

workplace." *Id.* at ¶ 5, Ex. A. Regarding harassment, the Company's policy explains and defines

harassment based on an associate's sex and other protected characteristics, and provides detailed

examples of the conduct that may constitute harassment. *Id.* at ¶ 5. Marriott also strongly

encourages associates to immediately report any suspected violation of its policy and provides

multiple prevention and reporting avenues. Specifically, the policy provides that:

> All associates are strongly encouraged (and supervisory associates
> are required) to report immediately any discrimination, harassment
> or retaliation to a member of their local Human Resources
> Department or the General Manager of a property, an area or
> regional Human Resources representative, or a member of corporate
> Human Resources. Alternatively, associates may use the Marriott
> Associate Hotline, 800-254-4375, to make a report at
> www.HOTethics.com or contact the Office of the General Counsel.
> You should not assume Marriott is aware of your concern. For
> Marriott to prevent and correct harassing and discriminatory
> conduct, it is essential that Marriott receive information about every
> instance of such conduct in a timely manner. Under no
> circumstances should you believe that you cannot or should not
> report any discrimination, harassment or retaliation. Do not allow an
> inappropriate or unlawful situation to continue by not reporting it,
> regardless of who is creating that situation.

*Id.* at ¶ 6, Ex. A.

The policy further provides that the Company "will not tolerate unlawful retaliation

directed against associates who make complaints of discrimination, harassment or retaliation,

report discrimination, harassment or retaliation they observe, or provide information relating to

such complaints or reports." *Id.* at ¶ 7. Marriott is committed to promptly investigating complaints

of discrimination or harassment and takes prompt remedial or disciplinary action as appropriate.

*Id.*

Marriott believes a safe work environment is fundamental to the success of all associates

and the Company. *Id.* at ¶ 8. Marriott's Workplace Violence Prevention Policy therefore

recognizes each associate has the right to a workplace free from intimidating, threatening or

dangerous behaviors and practices. The policy specifically states, "Marriott will not tolerate the following action by anyone at any level: Violence, threats of violence, intimidation or any conduct that creates an intimidating or otherwise offensive work environment." *Id.* at ¶ 8, Ex. B.

**B.    Plaintiff's Employment with Marriott.**

Plaintiff commenced her employment with Defendant at the Westin New York at Times Square Hotel (the "Hotel") on February 4, 2003. Ruiz Decl., ¶ 9; *see also* Declaration of Keya C. Denner, Esq. ("Denner Decl."), ¶ 2, Ex. A, excerpts from the transcript of the June 24, 2021 deposition of Cynthia Ball ("Ball Tr."), 56:17-20. Plaintiff was hired as a Cocktail Server. Ruiz Decl., ¶ 10. She currently works at what is now known as the Foundry Kitchen & Bar (the "Foundry Bar"). *Id.*

When Plaintiff started her position at the Hotel, she was provided a copy of Marriott's employee handbook. Ball Tr. 57:18-21. Plaintiff signed an Associate Acknowledgment of Marriott's Handbook on February 4, 2003. Ruiz Decl., ¶ 11, Ex. C. Plaintiff understood that Marriott maintains a "zero tolerance" policy regarding discrimination, harassment and retaliation occurring in the workplace or in connection with work. Ball Tr. 61:7-9. Plaintiff received Marriott's "zero tolerance" policy when she started working at the Hotel. Ball Tr. 62:17-22. Plaintiff also received Marriott's Workplace Violence Prevention policy upon starting work for the Hotel. Ball Tr. 65:7-10. Plaintiff also attended training sessions on these anti-harassment and violence prevention policies. Ball Tr. 65:14-25.

When Plaintiff was hired as a server at the Hotel, she became a member of a union. Ball Tr. 66:25; 67:1-11. Eventually, she became a union delegate – a position she remains in currently. *Id.* Plaintiff is currently a server at the Foundry Bar, and has not been suspended or demoted since September 18, 2017. Ruiz Decl., ¶ 12. Nor has her salary been reduced since that time. *Id.* Like all other employees who work at the Foundry Bar, Plaintiff was laid off for a period of time as a result

of COVID-19. Ruiz Decl., ¶ 13. However, since July 7, 2021, Plaintiff has been recalled to active duty. *Id.*

**C.**     **Plaintiff's Allegations of Harassment and the Hotel's Investigation and Response.**

**i.     *October 18, 2016 Incident***

On October 18, 2016, Plaintiff was working as a server at the Foundry Bar. Her shift ended at 11:00 p.m. Ball Tr., 117:19-25; 118:1-7. At around 10:45 or 10:50 p.m., Plaintiff reported to her supervisor Alexander Fish that a Hotel guest at the bar became intoxicated and was getting too close to her, had touched her face, and told her she "has to live her life." *Id.* at 75:16-25; 76:1-3; 118:4-7. Plaintiff "scrammed away" from the patron and told Mr. Fish, "[i]f you do not get him away from me, I am going to kill him." *Id.* at 76:11-17. In response, Mr. Fish stood between Plaintiff and the patron – effectively "blocking him" from coming into contact with Plaintiff – while she retrieved her drinks from the bar and finished up her work for the night. *Id.* at 76:18-24.

Plaintiff finished her shift without further incident. *Id.* at 78:18-24. Plaintiff did not report this incident to Hotel security or anyone else on October 18, 2016. *Id.* at 78:20-25; 79:1-4. Mr. Fish told a security manager, Steven Fisher, about Plaintiff's complaint, but by the time Mr. Fisher arrived at the bar, the guest had already gone up to his room and Plaintiff's shift had ended. Ruiz Decl., ¶ 14, Ex. D (Marriott 000230 – 000231); *see also* Ball Tr. 118:21-25.

On the morning of October 19, 2016, Mr. Fish emailed his supervisor, Zoe Cohen, Director of Restaurants and Bars, to report on the events that occurred at the end of Plaintiff's shift the night before. Ruiz Decl., ¶ 14, Ex. D (Marriott 000231). Plaintiff also sent a text message to Ms. Cohen on October 19, 2016, asking to talk. Ball Tr. 121:22-25; 122:1-11. On October 19, 2016, Ms. Cohen was at a recruiting event at Cornell with poor cellular phone service. Ruiz Decl., ¶ 14, Ex. D (Marriott 000231). Accordingly, Ms. Cohen sent a text back to Plaintiff stating that her service

was "spotty." Ball Tr. 122:12-18. Plaintiff responded that she would see Wanda Filion, Director of Human Resources Operations, before her shift started. Ruiz Decl., ¶ 14, Ex. D.

Plaintiff sent Ms. Filion an email asking to meet, in which Plaintiff acknowledged that she "was advised by another employee to fill out an incident report but I would like your advice before doing so." Denner Decl., Ex. B, P00051-52. Later that day, Plaintiff met with Ms. Filion to discuss the events of October 18, 2016. Ball Tr. at 79:20-25. Ms. Filion made notes of the meeting. Ruiz Decl., ¶ 15, Ex. E (Marriott 000232 – 000233).

The guest in question was checking out on October 20, 2016. Ruiz Decl., ¶ 14, Ex. D (Marriott 000230). As a result of her complaint, Plaintiff was informed she did not have to serve him again. *Id.*

### ii.    *September 10, 2017 Incident.*

On September 10, 2017, Plaintiff was working as a server at the Foundry Bar. Two men and two women were sitting at a table, and Plaintiff heard that the men cough into their hands the word "pussy" when Plaintiff walked by the table. Ball Tr. 99:12-20. Plaintiff complained to "Glenn," the interim manager on site that day, and also asked Jodi Erickson, the bartender, to call security. Ball Tr. 99:21-25; 100:1-2. One of the patrons asked Plaintiff to bring them shots of alcohol and the check, while "poking [Plaintiff] in the chest." Ball Tr. 100:3-9. A security officer then appeared, and Plaintiff told him she "had a problem with these guests" and asked for help. Ball Tr. 100:12-16. The security officer responded, "I got your back." *Id.* Plaintiff then left to go to the bar to fill the guests' drink orders. Ball Tr. 100:10-24. When she returned with the drinks, the security officer was gone. The guests paid their check and left the Foundry without further incident. *Id.*

The next day, September 11, 2017, Plaintiff sent an email to Ms. Cohen and Kerry Davis, Restaurant Manager, asking to meet. Denner Decl., Ex. C (Plaintiff's production, Marriott 000053

– 000054). Plaintiff, Ms. Davis and Ms. Cohen met on September 11, 2017 to discuss what had happened on September 10th. Ball Tr. 110:4-6. At the meeting Ms. Davis and Ms. Cohen stated they were not happy to hear what had happened. Ball Tr. 110:9-10. During this meeting, Ms. Cohen offered to discuss the matter with Glenn, but Plaintiff told Ms. Cohen she did not want her to address the matter with Glenn. Ball Tr. 110:9-17. Plaintiff did not report the matter to Human Resources. Ball Tr. 111:25; 112:1-7.

### iii.    September 18, 2017 Incident.

On Monday, September 18, 2017, Plaintiff alleged that an outside patron at the Foundry Bar (not a guest at the Hotel) purposefully touched her without her consent. Ruiz Decl., ¶ 16, Ex. F (Marriott 000007). During that evening, Plaintiff was working as a server at the Foundry Bar. Amorn Itinampong, Gladys Perera, and Manny Mendez were also working as servers. Ball Tr. 128:15-21. Dominick Franzo was the bartender, and Juan Carlos Libon was the bar back. *Id.; see also* Ball Tr. 190:3-5. Food and Beverage Manager Kerry Davis, Plaintiff's manager, was also working at the Foundry Bar that evening. Ball Tr. 128:3-4.

Plaintiff was facing the bar, when she claimed the patron "grabbed" her buttocks, and she felt his "fingers go between my buttocks." Ball Tr. 124:19-22; 129:12-15. She further elaborated that the man "put his hand on my right buttock and squeezed, and I felt his fingers go between the separation between the buttocks." Ball Tr. 127:9-11. She said this occurred for two or three seconds. Ball Tr. 127:12-14. After the alleged interaction, Plaintiff claimed she said something to the man, but she didn't know what she said. Ball Tr. 124:22-23. Plaintiff did not recall the man saying anything to her. Ball Tr. 175:21-22. Plaintiff had no physical response to the man's alleged inappropriate touching. Ball Tr. 205:8-10. After pausing for a second, Plaintiff exited the bar area through the rear exit to speak with her supervisor, Kerry Davis, who was standing outside the exit doors leading to the Hotel lobby. Ball Tr. 127:24-25; 128:1-8.

Plaintiff spoke with Ms. Davis, but she does not recall what she said to Ms. Davis, except that a man "just grabbed my ass." Ball Tr. 133:5-8; 135:12-13. Ms. Davis did not witness the alleged touching. Ball Tr. 128:13-14. Ms. Davis asked Plaintiff if the touch might have been accidental. Ball Tr. 125:2-4. Plaintiff responded it was not accidental. *Id.* Ms. Davis asked Plaintiff what she wanted to do. Denner Decl., Ex. D, excerpts from the transcript of the July 14, 2021 deposition of Kerry Davis ("Davis Tr."), 21:3-7. She then suggested that Plaintiff go get some air. Ball Tr. 125:2-4.

While Plaintiff was speaking to Ms. Davis, the man remained in the bar area. Ruiz Decl., ¶ 17, Ex. G, video footage from the Foundry Bar ("Video") at 8:10 – 9:42. Plaintiff did not identify the man for Ms. Davis, or point him out to her. Ball Tr. 133:5-8; Video at 8:10 – 9:42. Plaintiff did not ask Ms. Davis to call security. Ball Tr. 132:4-6. Nor did Plaintiff ask the bartender, Dominic Franzo, to call security. Ball Tr. 131:22:25; 132:1-3. Plaintiff did not call security, or ask others to do so, even though in the past she had asked bartenders or co-workers to call security when she had any incident with patrons at the Foundry Bar. Ball Tr. 131:17-18; 132:8-20. Plaintiff began to doubt herself, and whether she was "making a big deal out of nothing." Ruiz Decl., ¶ 18, Ex. H (Marriott 000010); Ball Tr. 149:3-6. Plaintiff then walked down the service corridor towards the bathrooms to "pull [herself] together." Ruiz Decl., ¶ 18, Ex. H (Marriott 000010).

While Plaintiff was in the service corridor, the man left the Foundry Bar. Video at 9:37 - 9:42. Plaintiff did not see the man leave. Ball Tr. 163:12-16; 164:3-6. Plaintiff decided to "get some air" or to smoke a cigarette, and that she would inform security of the incident at the dispatch station located at the employee entrance on her way out of the Hotel. Ball Tr. 131:20-21; 132:8-20; 163:6-11. Plaintiff exited the bar area, but before leaving she did not take any steps to identify

the man for Ms. Davis or anyone else before he left the bar. Video at 7:50 – 9:42. Ms. Davis followed Plaintiff out of the bar area. Video at 10:50 – 11:00.

Plaintiff then went to the cafeteria and met with Allen Israel, a security officer at the Hotel. Ruiz Decl., ¶ 18, Ex. H (Marriott 000010). Ms. Davis also went to the cafeteria. Ball Tr. 137:9-10. Plaintiff told Officer Israel what had happened and he "automatically encouraged [her] to write a report." Ruiz Decl., ¶ 18, Ex. H (Marriott 000010); Ball Tr. 150:4-7. Officer Israel "was very sympathetic and concerned." Ruiz Decl., ¶ 18, Ex. H (Marriott 000010); Ball Tr. 150:8-14. Officer Israel immediately alerted Security Manager Jim Reyes, who also reported to the cafeteria. Ruiz Decl., ¶ 19, Ex. I (Marriott 000004 – 000006). Officer Reyes asked Plaintiff if she wanted to go to the hospital, but she declined. Ball Tr. 125:18-24.

Officer Israel had Plaintiff write her statement down on an "Associate Statement" form, dated September 18, 2017. Ruiz Decl., ¶ 20, Ex. J (Marriott 000007); Ball Tr. 143:16-21. In the statement, Plaintiff stated she "was at bar to pick up drinks and felt a hand come from behind and grab [her] between [her] legs." *Id.*

After meeting with Officer Israel and Officer Reyes, Plaintiff went to the women's bathroom and threw up. Plaintiff was given permission to leave work early, and she went home. Ball Tr. 151:18-23.

### iv. The Hotel Immediately Conducts an Investigation Which Confirms the Eye Witness' Statement that the Touching was Accidental.

Immediately after Plaintiff reported the incident to Officer Israel, the Hotel began an investigation. In addition to the written statement from Plaintiff, Officer Israel and Officer Reyes proceeded to get statements from Kerry Davis and Dominick Franzo. Officer Israel also gave a statement. Ruiz Decl., ¶ 19, Ex. I (Marriott 000004 – 000006); Ball Tr. 142:3-11.

10

Bartender Dominick Franzo gave a written statement on September 18, 2017. Ruiz Decl., ¶ 21, Ex. K (Associate Statement, Marriott 000008). In his statement, Mr. Franzo wrote that he witnessed the guest approach the bar to collect his check, and proceed to sign the check in the service area. *Id.* The guest asked Mr. Franzo about the location of the Poppy Van Winkle bottle, and Mr. Franzo gave the location. Id. Mr. Franzo then stated that the guest "turned and collided with Cindy Ball the server." *Id.* Mr. Franzo did not corroborate Plaintiff's allegation that the man came from behind her and grabbed her between her legs. Ruiz Decl., ¶ 21, Ex. K (Associate Statement, Marriott-000008).

Kerry Davis also gave a written statement dated September 18, 2017. Ruiz Decl., ¶ 22, Ex. L (Associate Statement, Marriott 000009). In her statement, Ms. Davis noted that she did not observe the event in question but was sitting outside the restaurant when Plaintiff approached her to relay what had happened. *Id.* Ms. Davis thought that the guest had already left at the time Plaintiff came to speak to her. *Id.* Ms. Davis also noted that Mr. Franzo was a witness to the incident, and Mr. Franzo suggested the touching was accidental and did not confirm Plaintiff's version of events. *Id.*

As part of its investigation, the Hotel also considered a video of the incident captured by one of the security cameras at the restaurant. Ruiz Decl., ¶ 17, Ex. G. There are three cameras at the Foundry Bar. Ruiz Decl., ¶ 17. The camera capturing the incident is the only camera with a view of the area where the incident occurred. *Id.* The camera captures video only, and no audio. *Id.* The video confirmed Mr. Franzo's version of the events, and did not support Plaintiff's allegations of intentional inappropriate touching by the patron. Video at 7:21 - 8:05.

The video demonstrates that at around 6:21 p.m. on September 18, 2017, a patron got up from the area at which he was sitting and approached the bar. Video at 7:21. He went to the area

of the bar next to the servers' stand which housed the point of sale (POS) system. Video at 7:38. Specifically, the video shows the patron approached the bar. Video at 7:31 - 7:40. Plaintiff then approaches the area from behind the area occupied by the patron. Video at 7:41. The bartender, Dominick Franzo, appears on the video just as Plaintiff is approaching the bar area occupied by the patron, and he points towards Plaintiff and the patron at the bar. Video at 7:44 - 7:46; Ball Tr. 176:16-25; 177:1-4. As Mr. Franzo is looking and pointing towards her, Plaintiff bends over slightly in the area behind the patron, and when the patron turns around to leave the bar, the back of his right hand swings around and touches Plaintiff's rear. Video at 7:46 - 7:50. The video makes clear that Mr. Franzo witnessed the interaction between Plaintiff and the patron. Ball Tr. 176:16-25; 177:1-4. The patron appears surprised, says something to Plaintiff and then walks away. Video at 7:48 through 7:55. Plaintiff does not act surprised at all, lingers at the bar, and then slowly walks out of the restaurant rear exit. Video at 7:55 - 8:07.

The video then demonstrates that Plaintiff goes to speak to Ms. Davis, who is standing just outside the rear exit. Video at 8:08 - 9:41. During the time that Plaintiff is speaking to Ms. Davis, she does not point or gesture towards the patron to identify him to Ms. Davis, even though he is still inside the bar. *Id.* The video shows Plaintiff then walks towards the service stairs and Ms. Davis follows. Video at 9:14 - 9:31; Ball Tr. 187:12-25; 188:1-25. While Plaintiff remains by the service stairs, the patron leaves the Foundry Bar. *Id.*

On September 19, 2017 (the day after the alleged incident), Director of Human Resources Operations Maria Lavides called Plaintiff to discuss the Hotel's investigation thus far, and informed her that her "co-workers had been interviewed and no one saw it." Ball Tr. 164:9-12; 165:11-18. Also on September 19, 2017, Plaintiff emailed her union Business Agent, Marie Richard, claiming the patron "put his hand up [her] ass from behind." Ruiz Decl., ¶ 18, Ex. H

(Marriott 000010). Plaintiff admitted to Ms. Richard that right after the event occurred, she demonstrated a "lack of real response." *Id.* That same day, Plaintiff emailed the Hotel Manager, Sean Cassidy, asking for a meeting with the General Manager, Sean Verney, Mr. Cassidy, and Ms. Richard. Denner Decl., ¶ 6, Ex. E (Plaintiff's production, 000007). Plaintiff requested off from work on Tuesday, September 19, 2017, and Wednesday, September 20, 2017, although she had no available paid time off. Ball Tr. 156:13-18. The Hotel worked with Plaintiff to ensure she was given off these two days as FMLA days to recover after the alleged incident. Ruiz Decl., ¶ 23, Ex. M (Marriott 000012 – 000013); Ball Tr. 157:16-19. Plaintiff had her scheduled days off work on September 21, 2017, and September 22, 2017. Ruiz Decl., ¶ 23, Ex. M (Marriott 000012).

When Plaintiff returned to work on Monday, September 25, 2017, she met with Ms. Richard, Mr. Cassidy, and Ms. Lavides. 138:20-25; 139:1-5; 154:18-24. Plaintiff viewed the video of the incident for the first time at this meeting. Ball Tr. 120:4-8; 182:14-18. After viewing the video, Ms. Lavides asked Plaintiff if the patron apologized; in response, Plaintiff "scoffed" and "physically pounded [her] head on the table and said the man is a predator[,] [t]hey don't apologize." Ball Tr. 131:25; 132:1-12. After viewing the video, Ms. Richard asked to see the security report, which was provided to her. Ball Tr. 192:2-10. Ms. Lavides also provided Ms. Richard with a copy of the video. Ball Tr. 195:12-14. Plaintiff never asked the union for a copy of the video, because "[she] went to the police instead." Ball Tr. 195:12-20. Plaintiff never followed up with Ms. Richard regarding the matter after the September 25, 2017 meeting. Ball Tr. 192:11-12. Neither Ms. Richard nor anyone else from the union contacted Plaintiff to pursue the matter further. Ball Tr. 193:3-9.

A few days after the incident, Plaintiff went to the police station to make a report. 167:19-22. Plaintiff met with Detective Rosita Williams, and described the incident. Ball Tr. 168:21-25;

169:1-3. As part of Detective Williams' investigation, she reviewed the video of the incident. Ball Tr. 169:13-14. On or about October 31, 2017, Plaintiff met with Detective Williams to review the video footage together. Ball Tr. 170:6-16. After viewing the video with Detective Williams, Plaintiff did not ask her if what was in the video constituted "sexual assault." 171:9-19. Detective Williams did not tell Plaintiff that a crime had been committed. *Id.* This meeting was "the last [Plaintiff] bothered to pursue [the matter]" with Detective Williams. Ball Tr. 170:15-16. After this meeting, Detective Williams never called Plaintiff to discuss the matter again. Ball Tr. 170:17-19. Nor did Plaintiff call Detective Williams after that meeting to follow up with her. Ball Tr. 170:20-23.

On October 3, 2017, the Hotel opened a formal Ethics Point investigation, which confirmed the incident was not intentional. Ruiz Decl., ¶ 24, Ex. N (Marriott 000016 – 000017). Specifically, the investigator noted that "Maria [Lavides] did review camera footage and cannot confirm that the guest groped [Plaintiff]." *Id.*

On November 8, 2018, Plaintiff sent an email to her friends, John O'Hara and Aaron Jaffe. Denner Decl., ¶ 7, Ex. F (Plaintiff's production, 000072-000073). In the email, Plaintiff admits that she has doubts about her recollection of the events of September 18, 2017. Ball Tr. 202:10-19. Specifically, she noted: "Did I see what I thought I saw? Did I feel what I thought I felt? Did it happen at all? . . . but I'm no longer sure what I saw…So what happened? Now I'm no longer sure…" Denner Decl., ¶ 7, Ex. F (Plaintiff's production, 000072-000073).

Additionally, Plaintiff admits that an accidental touching by a guest is not a reportable event. Ball Tr. 204:3-5.

During the Hotel's investigation, Plaintiff claimed she did not feel safe at work following the incident. In an effort to quell her fear, the Hotel installed a panic button for associates to use to

14

quickly call security in case of any incident which warrants additional assistance. Ball Tr. 196:10:13. Since September 18, 2017, Plaintiff has not been subjected to any harassment on the job with Marriott. Ball Tr. 215:11-14. Plaintiff is unaware of any other people who have experienced harassment on the job at Marriott. Ball Tr. 215:7-10.

Accordingly, despite the Hotel's efforts to gather details about the patron and the incident to prevent future interactions, neither Plaintiff's co-workers nor the video of the incident could substantiate Plaintiff's allegations. To the contrary, the evidence revealed that Plaintiff's collision with the patron was accidental.

**D.**     **Plaintiff's Late Application for the Bartender Position.**

In May 2018, an opening existed for a bartender position at the Foundry Bar. Ruiz Decl., ¶ 25. The position was posted on May 9, 2018. Ruiz Decl., ¶ 26, Ex. O (Marriott 000376). Chris Miller, the newly appointed Director of Restaurants and Bars, was tasked with overseeing the hiring process for the new bartender. Declaration of Chris Miller ("Miller Decl."), ¶ 5; *see also* Davis Tr. 36:8-14. Mr. Miller had been hired by the Hotel as Director of Restaurants and Bars on May, 26, 2018 to replace Ms. Cohen, who had been moved to a different role in the Hotel. Miller Decl., ¶ 4. Prior to this, he had worked at a different hotel, the New York Marriott Marquis as Director of the View Complex. *Id.* Daniel Brower (Director of Human Resources Operations), Kristen Love (Assistant Director of Restaurants and Bars), and Sean Cassidy (Hotel Manager) were also involved in the bartender hiring process. Miller Decl., ¶ 5.

The majority of the applicants for the bartender job interviewed in early May 2018. Miller Decl., ¶ 6. Plaintiff applied for the position "very late" in the process, in that applications for the position were closing the day after Plaintiff decided to apply. Ball Tr. 217:16-24. Plaintiff had been aware that the position was open, but had been hesitant to apply because she likes the seniority she enjoys as a server. Ball Tr. 217:25; 218:1-9. Plaintiff informed Ms. Davis that she was

interested in the position, and because the time to apply was about to close, Ms. Davis brought Plaintiff to Human Resources immediately to apply. Ball Tr. 218:10-16. On June 4, 2018, Plaintiff interviewed for the bartender position with Director of Human Resources Operations Daniel Brauer. Ruiz Decl., ¶ 27, Ex. P (Marriott 000451 – 000455); Ball Tr. 218:17-20. A "couple of days" later, Plaintiff interviewed for the position with Hotel Manager Sean Cassidy. Ball Tr. 219:4-10.

Mr. Miller, Ms. Love, and Mr. Cassidy met in early June 2018 to discuss the hiring process. Miller Decl., ¶ 7. It was agreed that, because several candidates had interviewed well and were qualified for the job, Mr. Miller would create a written test. *Id.* Whichever candidate scored highest on the written test would be offered the bartender job. *Id.* On or around June 25, 2018, Mr. Miller created the written "Westin Time Square Bartender Practical Test." Miller Decl., ¶ 8, Ex. A (Marriott 000485 – 000488). Plaintiff took the Westin Time Square Bartender Practical Test on June 27, 2018. She scored 26/30. Miller Decl., ¶ 9, Ex. B (Marriott 000458 – 000462). Alfredo Tapia took the Westin Time Square Bartender Practical Test on June 26, 2018. He scored 27/30 – the highest score among the job applicants. Miller Decl., ¶ 10, Ex. C (Marriott 000447 – 000450).

On June 15, 2018, Mr. Cassidy's employment at the Hotel ended. Ruiz Decl., ¶ 28. Mr. Cassidy's departure was part of a broader change in the upper management team at the Hotel, which also included the hiring of a new General Manager, Michael Wlodkowski, in addition to a new Hotel Manager, David Behar. Ruiz Decl., ¶ 29. On July 1, 2018, Plaintiff posted the following message on her Facebook account:

> "[s]o there's been a huge regime change at work: Hotel director,
> hotel manager and HR director. All of them now want to be involved
> in choosing the goddamn bartender b/c it's, oh, you know, so
> fucking important. You'd think they were choosing a new CEO. It
> could be another 2 weeks before I hear. Of course I still might not

16

get the job so there might be a time when I am still waiting and
hoping."

Denner Decl., ¶ 8, Ex. G (Plaintiff's production, 000059).

Alfredo Tapia was hired for the bartender position on July 26, 2018. Ruiz Decl., ¶ 30;
Miller Decl., ¶ 11.

**E.**      **Plaintiff Files an Administrative Claim Against Marriott, Followed by this Lawsuit.**

Plaintiff filed her Verified Complaint with the New York Division of Human Rights
("NYSDHR") on or about April 30, 2018. Ruiz Decl., ¶ 31, Ex. Q. The NYSDHR sent Plaintiff's
Verified Complaint to the Hotel by letter dated August 8, 2018. Ruiz Decl., ¶ 32, Ex. R. On May
30, 2019, the NYSDHR issued a right to sue letter to Plaintiff, finding no probable cause to
proceed. Ruiz Decl., ¶ 33, Ex. S. On November 15, 2019, Plaintiff filed her Complaint in this
action. *See* ECF No. 1.

# LEGAL ARGUMENT

## POINT I

## SUMMARY JUDGMENT IS APPROPRIATE AS THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and alterations omitted). If the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted to the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). For the reasons set forth below, Defendant satisfies its burden to demonstrate that there are no genuine disputes as to any material fact and based on the record, Plaintiff's claims fail as a matter of law.

## POINT II

## PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM FAILS AS A MATTER OF LAW

### A.   Plaintiff's 2016 Allegations are Time Barred.

As a threshold matter, Plaintiff's allegations regarding the October 2016 incident are time barred and cannot be used to support her hostile work environment claim. "Title VII requires an aggrieved party to file a charge of discrimination with either the Equal Employment Opportunity Commission or the New York State Division of Human Rights ("NYSDHR") within 300 days of the alleged act of discrimination; the failure to do so will result in the claims being time-barred."

*Johnson v. Buffalo Police Dep't*, 46 F. App'x 11, 13 (2d Cir. 2002) (summary order) (citing 42 U.S.C. § 2000e-5(e)). Moreover, "[b]efore filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies." *Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) (summary order). Indeed, "[a]n allegation not set forth in an administrative charge will be barred as unexhausted unless it is reasonably related to the allegations in the charge." *Id.* (citing *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (per curiam)). "A new allegation will be considered reasonably related if the administrative charge provided the [agency] with sufficient notice to investigate the allegation." *Id.* (citing *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006)); *see also Butts v. City of New York Dept. of Housing Preservation and Development*, 990 F.2d 1397, 1401 (2d Cir. 1993), *superseded by statute on other grounds as stated in, Hawkes v. 1115 Legal Servs. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("A district court only has jurisdiction to hear Title VII claims that are either included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge.") (internal citations omitted).

In light of the 300 day statute of limitations, any claim arising from the October 18, 2016 incident needed to be included in an administrative claim no later than August 14, 2017 in order to be timely. Plaintiff did not meet this deadline, as she filed a Verified Complaint with the NYSDHR on or about April 30, 2018, some eight months too late. *See* 56.1 Stm. ¶ 121, Ruiz Decl., ¶ 32, Ex. R.

Moreover, a simple review of Plaintiff's Complaint and the alleged timeline demonstrates that her allegations regarding alleged harassment on October 18, 2016 are not reasonably related to her Complaint because the events are separate, isolated incidents. Virtually all of the persons involved in the alleged October 2016 incident (including the offending guest, the bartender,

19

Plaintiff's manager, and the Director of Human Resources Operations) are different from those involved in the September 2017 incident.

Accordingly, Plaintiff's claims related to the October 18, 2016 incident are time barred, and, therefore, Defendant's motion for summary judgment with respect to any claim arising out of conduct that occurred on October 18, 2016 must be granted.

**B.**      **Plaintiff Cannot Establish a *Prima Facie* Case of Hostile Work Environment Under Title VII in Connection with the September 2017 Incidents.**

To establish she was subjected to an unlawful hostile work environment, Plaintiff must establish the "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult[] that [was] sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.'" *Encarnacion v. Isabella Geriatric Ctr., Inc.*, No. 1:11-cv-3757-GHW, 2014 WL 7008946, at *10 (S.D.N.Y. Dec. 12, 2014) (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d Cir. 2010)). That requires a showing that (1) the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (2) a basis exists for imputing the objectionable conduct to the employer. *See Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 6 (2d Cir. 2017). The "severe or pervasive" standard has "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also perceive that environment to be abusive." *McGullam v. Cedar Graphics*, *Inc.*, 609 F.3d 70, 79 (2d Cir. 2010).

"To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Relevant factors include the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

As set forth below, Plaintiff cannot sustain her hostile work environment claim as a matter of law because she cannot establish her *prima facie* claim and there is no basis to impute liability to Marriott.

### 1.     Plaintiff Was Not the Victim of Severe or Pervasive Workplace Hostility.

Plaintiff cannot demonstrate a *prima facie* claim for hostile work environment because she cannot establish that the workplace was objectively and subjectively so severe or pervasive so as to alter the conditions of her employment *Duplan v. City of NY*, 888 F.3d 612, 627 (2d Cir. 2018). Under Title VII, the *prima facie* case has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, **and** the plaintiff must subjectively perceive the work environment to be abusive. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010). Whether the conduct in question is objectively severe or pervasive depends upon the "totality of the circumstances," and includes considerations such as its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).

Plaintiff's allegations in this case are insufficient to meet the "high bar" of the standard above.  *Duplan*, 888 F.3d at 627.

#### i.     *September 10, 2017 Incident.*

Plaintiff alleges that she was working as a server at the Foundry Bar on September 10, 2017 when two men and two women were sitting at a table, and Plaintiff heard the men cough into their hands the word "pussy" when she walked by the table. *See* 56.1 Stm. ¶ 29, Ball Tr. 99:12-20.

She further contends that one of the patrons asked Plaintiff to bring them shots of alcohol and the check, while "poking [Plaintiff] in the chest." *See* 56.1 Stm. ¶ 33, Ball Tr. 100:3-9. This incident, however, does not create a hostile work environment as a matter of law.

The law is clear that not every offensive utterance will give rise to a hostile work environment. *Holohan v. Newmark & Co. Real Est., Inc.*, No. 18-CV-6275 (AJN), 2019 WL 4743883, at *3 (S.D.N.Y. Sept. 16, 2019). Here, the allegedly offensive conduct – coughing the word "pussy" into their hands – does not even rise to the level of the sexually charged comments and conduct set forth in *Dayes v. Pace Univ.*, No. 98 Civ. 3675 (WHP), 2000 WL 307382, at *1, 4–5 (S.D.N.Y. Mar. 24, 2000), aff'd, 2 F. App'x 204 (2d Cir. 2001) (granting summary judgment to defendant where plaintiff was subjected to at least six sexual comments and multiple requests for dates, was screamed at by a supervisor, and was touched on the back); and *Lucas v. S. Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 147–49 (E.D.N.Y. 1998) (denying plaintiff's hostile work environment claim where supervisor brushed against plaintiff three times, touched plaintiff three times, briefly touched plaintiff's back or shoulders five to seven other times, asked about the color of plaintiff's underwear, said plaintiff wanted to "go to bed" with her, and said "fuck you" to plaintiff on more than one occasion), which still was not sufficient to establish a *prima facie* hostile work environment claim. Indeed, the conduct complained of – although crude and sophomoric – is not based on Plaintiff's gender, and does not even specifically invoke sex or a sexual act. To be clear, Plaintiff does not assert that the two men were making lude or inappropriate sexual gestures or innuendo; rather, they simply coughed the word "pussy." Nor does Plaintiff claim this was directed specifically at her or any other women at the Foundry Bar. Accordingly, the Court should not find this phrase, by itself, is severe enough to create an abusive environment.

Even if the remark was sexually charged, it is well-settled that isolated incidents of offensive misconduct alone do not create a work environment permeated with discriminatory intimidation. *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 517 n.12 (S.D.N.Y. 2016). As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted to be deemed pervasive. *Id.* To be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. *Id.* (collecting cases). A stray remark, unsupported by any other evidence of discriminatory animus, creates no inference of discrimination. *Id.* (citing *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CIV. 4096 (SAS), 2003 WL 22015434, at *6 (S.D.N.Y. Aug. 25, 2003)). Here, the alleged remark from these customers was a "one off" event. Plaintiff does not allege that these customers returned on other occasions and hurled insults at her or others at the bar. Nor does she allege that sexually charged comments were regularly made by other customers at the bar, and the Hotel failed to stop it. Therefore, the stray remark cannot rise to the objective level of a "severe or pervasive" intimidation, ridicule, and insult in the workplace.

### ii.    September 18, 2017 Incident.

Plaintiff alleges that on September 18, 2017, a bar patron at the Foundry Bar (not a guest of Defendant) "grabbed" her buttocks, and she felt his "fingers go between my buttocks." *See* 56.1 Stm. ¶¶ 40, 42, Ball Tr. 124:19-22; 129:12-15. She further elaborated that the man "put his hand on my right buttock and squeezed, and I felt his fingers go between the separation between the buttocks" for approximately two or three seconds. *See* 56.1 Stm. ¶ 42, Ball Tr. 127:9-11. The undisputed record evidence, however, does not demonstrate a *prima facie* hostile work environment because: 1) given the video of the incident, an objective person would consider the patron's touching to be accidental, and 2) Plaintiff's own conduct belies her claim that the conduct

was severe, including her failure to identify the patron immediately after the collision, and her candid admissions on several occasions that she was unsure of the severity of the conduct.

The record on this motion shows Plaintiff acted inconsistently with someone who had just been sexually assaulted. Immediately after the collision, Plaintiff is seen on video with no physical reaction at all. She lingers at the server station, and then casually makes her way out of the rear exit. She does not point the man out to Ms. Davis, or anyone else, even though he remains in the bar for several minutes after the collision. Indeed, the patron leaves the bar without Plaintiff alerting anyone to his presence, or that he should be stopped. Plaintiff does not call security, or ask others to do so. Plaintiff's inaction in this context is notable, given that on several past occasions she had asked bartenders or co-workers to call security when she had incidents with patrons at the Foundry Bar. *See* 56.1 Stm. ¶ 55, 131:17-18; 132:8-20. Plaintiff also decided not to follow up with the union, and never pursued her criminal case after watching the video with Detective Williams.

Plaintiff's physical reaction (or inaction) to the collision is consistent with her candid admissions in this lawsuit that she had doubts about the severity of the incident. These doubts manifested almost immediately, as she testified in her deposition that right after speaking to Ms. Davis, she asked herself whether she was "making a big deal out of nothing." *See* 56.1 Stm. ¶ 56, Ruiz Decl., ¶ 18, Ex. H (Marriott 000010); Ball Tr. 149:3-6. Sometime later, Plaintiff emailed her friends John O'Hara and Aaron Jaffee, and admitted that after again viewing the video of the event, she had doubts about her recollection of the events of September 18, 2017. *See* 56.1 Stm. ¶ 97, Denner Decl., ¶ 7, Ex. F (Plaintiff's production, 000072 – 000073). Specifically, she noted: "Did I see what I thought I saw? Did I feel what I thought I felt? Did it happen at all? . . . but I'm no longer sure what I saw…So what happened? Now I'm no longer sure…" *See* 56.1 Stm. ¶ 97, Denner Decl., ¶ 7, Ex. F (Plaintiff's production, 000072 – 000073). Plaintiff's own admissions,

therefore, establish that she did not perceive the environment as sufficiently severe or pervasive, a fundamental requirement of her *prima facie* claim. *McGullam*, 609 F.3d at 79.

Even if Plaintiff subjectively believed the incident to be so severe as to create a hostile work environment, the record evidence demonstrates that a reasonable person would not. Notably, the bartender, Mr. Franzo, was an eyewitness and was within a few feet of the collision between the patron and Plaintiff. On the evening of the incident, he provided a written statement confirming the collision was an accident, and that the patron did not purposely grab Plaintiff's buttocks from behind. *See* 56.1 Stm. ¶ 71, Ruiz Decl., ¶ 21, Ex. K (Associate Statement, Marriott 000008). Also, many people viewed the video of the incident, including Maria Lavides, Marie Richard, and Detective Williams. Ms. Lavides concluded that the video supported Mr. Franzo's eyewitness account. *See* 56.1 Stm. ¶ 88. Tellingly, Ms. Richard and Plaintiff's union did not pursue the matter on her behalf. And Detective Williams found no evidence of sexual assault, and did not otherwise pursue the matter. *See* 56.1 Stm. ¶ 95. Accordingly, Plaintiff cannot establish that the conduct was objectively severe or pervasive, as the individuals on site at the time of the incident and those who viewed the video perceived the incident to be an accident.

Indeed, courts in the Second Circuit have repeatedly granted summary judgment in favor of defendants in cases ***where the conduct was exponentially more egregious*** than the conduct alleged in this case. *See e.g. Anderson v. Davis Polk & Wardwell, LLP*, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012) (holding that plaintiff's allegations that supervisor would "come around my cube on occasions and place her vagina literally on my left shoulder or inches from my face" insufficient to state a hostile work environment claim); *Prince v. Cablevision Sys. Corp.*, No. 04 CIV.8151(RWS), 2005 WL 1060373, at *7–10 (S.D.N.Y. May 6, 2005) (dismissing hostile work environment claim based on allegations that a senior employee made sexual advances toward

plaintiff, solicited her for sex, and tried to kiss her); *Soliman v. Deutsche Bank*, No. 03 CIV. 104 (CBM), 2004 WL 1124689 (S.D.N.Y. May 20, 2004) (touching plaintiff's arm and shoulders, sitting close to plaintiff and commenting that plaintiff was a "good looking guy," inviting plaintiff to social events and a "gay" bar, and asking plaintiff about his personal life insufficient to establish a Title VII claim); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97 CIV.4661 RCC, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003), aff'd, 120 F. App'x 408 (2d Cir. 2005) (plaintiff's claim that her male supervisor complimented her hair and eyes, commented that she looked good in tight pants, and referred to her as a "bitch" was insufficient to maintain hostile work environment claim).

Therefore, as a matter of law, Plaintiff cannot prevail on her hostile work environment claim.

### 2.    <u>Plaintiff Cannot Establish a Basis for Imputing Liability to Marriott.</u>

Even if Plaintiff experienced sufficiently "severe" conduct (which she did not), Marriott is not liable under Title VII unless "a specific basis exists for imputing the objectionable conduct" to Marriott. *Feingold*, 366 F.3d at 152. To be held vicariously liable for a hostile work environment created by a non-employee, "'the employer will be held liable only for its own negligence,' and the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for compliant or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (citing 29 *C.F.R.* § 1604.11(e) and *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). "In determining the appropriateness of an employer's response, courts look to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the non-employee's] behavior.'" *Creacy v. BCBG Max Azria Grp.*, LLC, No. 14 CIV. 10008 (ER), 2017 WL 1216580, at *9 (S.D.N.Y. Mar. 31, 2017) (citing *Summa*, 708 F.3d at 124).

The Second Circuit has held that employers have a "remedial obligation to address and end the harassment" and the Court will assess whether the complaint "was dealt with quickly and in proportion to the level of seriousness of the event." *Creacy* 2017 WL 1216580, at *9. In other words, Courts have held that "employers can be liable to employees who are harassed by third parties, but only if the employer failed to take reasonable action." *Ocasio v. Mohawk Valley Cmty. Coll.*, No. 620CV1355GTSATB, 2021 WL 4477241, at *13 (N.D.N.Y. Sept. 30, 2021). Here, as explained below, Plaintiff cannot create a genuine issue of fact as to the reasonableness of Marriott's remedial measures.

First, after Plaintiff complained about the September 10, 2017 incident, she immediately met with Zoe Cohen, Director of Restaurants and Bars, and Kerry Davis, Restaurant Manager, the following day. *See* 56.1 Stm. ¶¶ 36-39. During the meeting, Ms. Cohen offered to discuss the matter with "Glenn," the manager on duty that day, but Plaintiff told her she did not want to address it with him and Plaintiff did not report the matter to Human Resources. *See* 56.1 Stm. ¶¶ 37-38, Ball Tr. 110:9-17.

Second, although Plaintiff claims that she felt harassed by the patron on September 18, 2017, once Plaintiff escalated her concerns, the record evidence shows Marriott promptly and thoroughly investigated her allegation:

- After Plaintiff reported the incident to Allen Israel, a security officer at the Hotel, he "automatically encouraged [her] to write a report." *See* 56.1 Stm. ¶¶ 62-64, Ruiz Decl., ¶ 18, Ex. H (Marriott 000010); Ball Tr. 150:4-7.

- Officer Israel immediately alerted Security Manager Jim Reyes, who asked Plaintiff if she wanted to go to the hospital, but she declined. *See* 56.1 Stm. ¶¶ 66-67, Ruiz Decl., ¶ 19, Ex. I (Marriott 000004 – 000006), Ball Tr. 125:18-24.

- Officer Israel had Plaintiff write her statement down on an "Associate Statement" form, dated September 18, 2017. *See* 56.1 Stm. ¶¶ 68-69, Ruiz Decl., ¶ 20, Ex. J (Marriott 000007); Ball Tr. 143:16-21.

27

- Officer Israel and Officer Reyes proceeded to get statements from Ms. Davis, Mr. Franzo and Officer Israel that very same night. *See* 56.1 Stm. ¶ 70, Ruiz Decl., ¶ 19, Ex. I (Marriott 000004 – 000006); Ball Tr. 142:3-11.

- Mr. Franzo did not substantiate Plaintiff's allegations, and made clear that the incident was an accident. *See* 56.1 Stm. ¶¶ 71-72, Ruiz Decl., ¶ 21, Ex. K (Associate Statement, Marriott 000008).

- Ms. Davis further noted that Mr. Franzo suggested the touching was accidental and did not confirm Plaintiff's version of events. *See* 56.1 Stm. ¶ 73, Ruiz Decl., ¶ 22, Ex. L (Associate Statement, Marriott 000009).

- Marriott reviewed video surveillance of the incident captured by one of the security cameras at the restaurant. *See* 56.1 Stm. ¶ 74, Ruiz Decl., ¶ 17, Ex. G. The video confirmed that Mr. Franzo witnessed the interaction between Plaintiff and the patron. *See* 56.1 Stm. ¶ 75, Video at 7:21 - 8:05. The video corroborated Mr. Franzo's version of the events, and did not support Plaintiff's allegations of intentional inappropriate touching by the patron. *See* 56.1 Stm. ¶ 79.

- The day after the incident, Director of Human Resources Operations Maria Lavides called Plaintiff to discuss Marriott's investigation and keep her informed. *See* 56.1 Stm. ¶ 83, Ball Tr. 164:9-12; 165:11-18. Plaintiff also requested two days off from work, despite having no available paid time off. *See* 56.1 Stm. ¶ 86, Ball Tr. 156:13-18. Marriott accommodated Plaintiff, and granted her FMLA days to recover after the alleged incident. *See* 56.1 Stm. ¶ 86, Ruiz Decl., ¶ 23, Ex. M (Marriott 000012 – 000013); Ball Tr. 157:16-19.

- When Plaintiff returned to work on September 25, 2017, she promptly met with Ms. Richard, Mr. Cassidy, and Ms. Lavides. *See* 56.1 Stm. ¶ 88, Ball Tr. 138:20-25; 139:1-5; 154:18-24. They all viewed the video of the incident together. *See* 56.1 Stm. ¶ 88, Ball Tr. 120:4-8; 182:14-18. After viewing the video, Ms. Richard asked to see the security report, which was provided to her. *See* 56.1 Stm. ¶ 89, Ball Tr. 192:2-10. Ms. Lavides also provided Ms. Richard with a copy of the video. *See* 56.1 Stm. ¶ 90, Ball Tr. 195:12-20.

- Approximately two weeks after the incident, on October 3, 2017, Marriott opened a formal Ethics Point investigation, which confirmed the incident was not intentional. *See* 56.1 Stm. ¶ 96, Ruiz Decl., ¶ 24, Ex. N (Marriott 000016 – 000017). Specifically, the investigator noted that "Maria [Lavides] did review camera footage and cannot confirm that the guest groped [Plaintiff]." *Id.*

- During Marriott's investigation, Plaintiff claimed she did not feel safe at work following the incident. Therefore, Marriott installed a panic button for associates to use to quickly call security in case of any incident which warrants additional assistance. *See* 56.1 Stm. ¶ 99, Ball Tr. 196:10:13.

28

As demonstrated above, Marriott took immediate remedial measures that were appropriate in light of the circumstances. *Summa*, 708 F.3d at 124. Plaintiff cannot dispute that Marriott took prompt action on her complaint and exercised reasonable care to address her issues.

There have been no allegations of sexual harassment by Plaintiff following Marriott's investigation. *See* 56.1 Stm. ¶ 100, Ball Tr. 215:11-14. Nor is Plaintiff aware of any other Marriott employees who were subjected to harassment by customers since September 18, 2017. *See* 56.1 Stm. ¶ 101, Ball Tr. 215:7-10. Based on the foregoing, Plaintiff cannot dispute that Marriott's response was "immediately [and] timely and appropriate in light of the circumstances." *Summa*, 708 F.3d at 124. Therefore, Plaintiff cannot establish that Marriott fostered a hostile work environment under Title VII.

## POINT III

## PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF FACT AND LAW

### A.   Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation Under Title VII.

Plaintiff's retaliation claim under Title VII must be analyzed under the familiar burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a *prima facie* case for retaliation under Title VII, Plaintiff must show (1) participation in a protected activity; (2) Marriott knew of that activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Adams v. Yale New Haven Hosp.*, 558 F. App'x 72, 74 (2d Cir. 2014). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "offer through the introduction of admissible evidence a legitimate non-[retaliatory] reason for the discharge [or other form of retaliatory action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. For Mental Health for Jamaica Cmty, Adolescent*

*Program*, 198 F.3d 68, 72 (2d Cir. 1999)).

Here, Plaintiff cannot establish the fourth element of her *prima facie* case against Defendant because she cannot prove causation between the protected activity and any alleged adverse employment action. For an adverse retaliatory action to be "because" a plaintiff participated in protected activity, the "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* at 90–91. Plaintiff must show "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91.

Plaintiff contends that the adverse employment action that she endured was not being hired for a bartender position that was filled in July 2018. *See* 56.1 Stm. ¶¶ 103-104, 107-108, 120. However, the time between Plaintiff's complaint about a hostile work environment and her failure to receive the bartender position approximately ten months later is too attenuated to establish retaliation. *See Ragin v. E. Rampapo Cent. Sch. Dist.,* No. 05 CIV. 6496 (PGG), 2010 WL 1326779, at *31 (S.D.N.Y. Mar. 31, 2010), aff'd, 417 F. App'x 81 (2d Cir. 2011) (four months between plaintiff's protected activity and her employer's decision not to promote too attenuated to establish causation for retaliation claim); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.").

In addition, there is no causal link between Plaintiff's September 18, 2017 complaint and her failure to get the bartender job, because different decision-makers were involved in responding to her complaint, on the one hand, and the final decision to hire the bartender, on the other. *See*

*Seivright v. Montefiore Med. Ctr.,* No. 11 CIV. 8934 AJN, 2014 WL 896744, at *10 (S.D.N.Y. Mar. 3, 2014) (citing *Davis v. Peake*, No. 08-cv-3570, No. 08 CIV. 3570 KTD, 2011 WL 4407551(S.D.N.Y. Sept. 20, 2011) (holding no causal connection where there was no evidence the decision-makers were aware of the protected activity)). "Furthermore, [while] the Second Circuit has elucidated that it is not required that particular individuals know of the protected activities at issue to satisfy the second element of the retaliation analysis, it is equally clear that such lack of knowledge by decision-makers undercuts a claim of a causal connection." *See Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."); *see also Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (applying *Gordon* to the fourth element of causal connection).

When Plaintiff applied to the bartender position in May 2018, Chris Miller, the newly appointed Director of Restaurants, was tasked with overseeing the interview and hiring process for the new bartender. *See* 56.1 Stm. ¶ 105, Miller Decl."), ¶ 5; Davis Tr. 36:8-14. Mr. Miller had only been hired by the Hotel as Director of Restaurants on May 26, 2018. *See* 56.1 Stm. ¶ 105 Miller Decl., ¶ 4. Prior to this, he had worked at a different hotel, the New York Marriott Marquis as Director of the View Complex. *See* 56.1 Stm. ¶ 105, Miller Decl., ¶ 4. Director of Human Resources Operations Daniel Brower, Assistant Director of Restaurants and Bars Kristen Love, and Hotel Manager Sean Cassidy were also involved in the bartender hiring process. *See* 56.1 Stm. ¶ 106, Miller Decl., ¶ 5.

Of those individuals, only Mr. Cassidy was involved in the Hotel's response to Plaintiff's September 2017 complaint. On June 15, 2018, however, Mr. Cassidy's employment at Marriott

ended, and as of that date no hiring decision had been made. *See* 56.1 Stm. ¶ 117, Ruiz Decl., ¶ 28. Moreover, Mr. Cassidy's departure was part of a broader change in the upper management team at the Hotel, which also included the hiring of a new General Manager, Michael Wlodkowski, in addition to a new Hotel Manager, David Behar. *See* 56.1 Stm. ¶ 118, Ruiz Decl., ¶ 29. Plaintiff was not only aware of this restructuring, ***but she admitted in her July 1, 2018 Facebook post that this new management team would determine which applicant would be hired for the vacant bartender role***:

> "[s]o there's been a huge regime change at work: Hotel director, hotel manager and HR director. All of them now want to be involved in choosing the goddamn bartender b/c it's, oh, you know, so fucking important. You'd think they were choosing a new CEO. It could be another 2 weeks before I hear. Of course I still might not get the job so there might be a time when I am still waiting and hoping."

*See* 56.1 Stm. ¶ 119, Denner Decl., ¶ 8, Ex. G (Plaintiff's production, 000059).

Over a month after Mr. Cassidy's employment ended, Alfredo Tapia was hired for the bartender position on July 26, 2018. *See* 56.1 Stm. ¶ 120, Ruiz Decl., ¶ 30; Miller Decl., ¶ 11. There can be no dispute, therefore, that Mr. Cassidy played no role in choosing the successful applicant for the job. Without Mr. Cassidy, Plaintiff cannot demonstrate any causal link between her protected activity and her failure to get the job, and, therefore, she cannot establish her *prima facie* case of retaliation.

Furthermore, to the extent that Plaintiff alleges she did not receive the bartender job in retaliation for filing her NYSDHR Complaint, there is no causal connection. Defendant was not made aware of the Complaint until August 8, 2018, and as set forth above, the bartender position was filled on July 26, 2018. *See* 56.1 Stm. ¶¶ 120, 122. Accordingly, there is no causal link between Plaintiff's NYSDHR Complaint and her not receiving the bartender position.

**B.** **Assuming Arguendo Plaintiff Could Establish a Prima Facie Case of Retaliation, Defendant has Proffered a Legitimate, Non-Retaliatory Reason for Plaintiff Not Receiving the Position.**

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of retaliation, which she cannot, the burden of production shifts to Defendant to come forward with a non-retaliatory reason for Plaintiff's failure to get the bartender job. *Leifer v. N.Y. State Div. of Parole*, 391 F. App'x 32, 34 (2d Cir. 2010). As shown below, Defendant has met this burden.

The bartender position was posted on May 9, 2018. *See* 56.1 Stm. ¶ 104, Ruiz Decl., ¶ 26, Ex. O (Marriott 000376). Plaintiff interviewed for the bartender position with Human Resources Director Daniel Brauer on June 4, 2018. *See* 56.1 Stm. ¶ 111, Ruiz Decl., ¶ 27, Ex. P (Marriott 000451 – 000455); Ball Tr. 218:17-20. A "couple of days" later, Plaintiff interviewed for the position with Mr. Cassidy. *See* 56.1 Stm. ¶ 112, Ball Tr. 219:4-10.

Mr. Miller, Ms. Love, and Mr. Cassidy met in early June 2018 to discuss the hiring process. *See* 56.1 Stm. ¶ 113, Miller Decl., ¶ 7. It was agreed that, because several candidates had interviewed well and were qualified for the job, Mr. Miller would create a written test and whichever candidate scored highest on the written test would be offered the bartender job. *See id.* On or about June 25, 2018, Mr. Miller created the written test. *See* 56.1 Stm. ¶ 114, Miller Decl., ¶ 8, Ex. A (Marriott 000485 – 000488).

Plaintiff took the written bartender practical test on June 27, 2018. *See* 56.1 Stm. ¶ 115, Miller Decl., ¶ 9, Ex. B (Marriott 000458 – 000462). She scored 26/30. *See id.* Alfredo Tapia took the written bartender practical test on June 26, 2018. *See* 56.1 Stm. ¶ 116, Miller Decl., ¶ 10, Ex. C (Marriott 000447 – 000450). He scored 27/30 – the highest score among the job applicants. *See id.* Since Alfredo Tapia received the highest score, he was hired for the bartender position on July 26, 2018. *See* 56.1 Stm. ¶ 120, Ruiz Decl., ¶ 30; Miller Decl., ¶ 11.

Based on the foregoing, Defendant has proffered a legitimate, non-retaliatory reason for

Plaintiff not receiving the bartender position – namely, that she did not receive the highest score on the written test. Accordingly, the burden shifts back to the Plaintiff to establish that Defendant's proffered reason was a pretext for retaliation, which she cannot do. "In the summary judgment context, this means plaintiff must 'establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the adverse employment action] is false and as to whether it is more likely that a [retaliatory] reason motivated the employer to make the adverse employment decision.'" *Payne v. Cornell Univ.*, No. 18-CV-1442 (GTS/ML), 2021 WL 39684, at *10 (N.D.N.Y. Jan. 5, 2021) (quoting *Welsh v. Rome Mem. Hosp., Inc.*, No. 614CV1423DNHATB, 2016 WL 6603216, at *3 (N.D.N.Y. Nov. 8, 2016) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994))). Plaintiff can only survive summary judgment by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Henderson v. Sikorsky Aircraft Corp.*, 590 F. App'x 9, 10 (2d Cir. 2015).

There is zero evidence in the record for Plaintiff to demonstrate any "weaknesses, implausibilities, inconsistencies, or contradictions" with Marriott's stated reason why Plaintiff was not offered the bartender job. An objective criterion was applied (i.e. whoever scored highest on the test). There is no argument Mr. Tapia scored higher than Plaintiff on the test. Moreover, by Plaintiff's own admission, the new management team who ultimately hired Mr. Tapia had no connection to Plaintiff's prior protected activity.

For the forgoing reasons, Defendant's motion for summary judgment on Plaintiff's retaliation claim must be granted in its entirety.

## <u>CONCLUSION</u>

Based on the analysis provided above and the undisputed material facts contained in Defendant's Rule 56.1 Statement, Defendant's Motion for Summary Judgment should be granted in its entirety on Plaintiff's Title VII hostile work environment and retaliation claims.

Dated: Berkeley Heights, New Jersey
      October 29, 2021

FORD HARRISON LLP

By:    */s/ Keya C. Denner*
    Keya C. Denner
    Timothy M. Barbetta
    300 Connell Drive, Suite 4100
    Berkeley Heights, NJ 07922
    Phone: (973) 646-7308
    Fax: (973) 646-7301
    E-mail: kdenner@fordharrison.com
    E-mail: tbarbetta@fordharrison.com
    *Attorneys for Defendant*