UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
CYNTHIA BALL,

                          Plaintiff,                          Docket No.: 19-CV-10593
                                                       (JPO)(KHP)
          -against-

MARRIOTT INTERNATIONAL, INC.,

                        Defendant.
-----------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT's
<u>MOTION FOR SUMMARY JUDGEMENT</u>**

RICOTTA & MARKS, P.C.
*Attorneys for the Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 11101
(347) 464-8694

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………..ii

PRELIMINARY STATEMENT…………………………………………………………1

STATEMENT OF FACTS…….………………………………………………………1

LEGAL ARGUMENT………………………………………………………………….8

SUMMARY JUDGMENT STANDARD……………………….....………………..……..8

PLAINTIFF'S CLAIMS ARE TIMELY…………….……………………………………10

PLAINTIFF'S TIMELY CLAIMS…………….…..………………………………....10

CONTINUING VIOLATION AND BACKBROUND EVIDENCE……….....…………...……10

PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS…..………..……….....……11

DEFENDANT LIABILITY UNDER TITLE VII…………………………………….........14

DEFENDANT ACTED UNREASONABLY………………………………………...............15

PLAINTIFF'S RETALIATION CLAIMS……..……………………………….........16

CASUAL CONNECTION/PRETEXT………...……………………………………........17

CONCLUSION……………………………………………………………………..19

# TABLE OF AUTHORITIES

**CASE LAW**                                                                                   **Page(s)**

Cases

American Mfrs. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1967)............................................................................................................... 9

Bennett v. Health Management Sys., Inc., 936 N.Y.S.2d 112, 123 (2d Dept. 2011) .................. 17

Bickerstaff v. Vassar Coll., 196 F. 3d 435, 448 (2d Cir. 1999) .................................................... 9

Borrero v. Collins Bldg. Services, Inc., 2002 WL 31415511, at *15 (S.D.N.Y Oct. 25, 2002)... 16

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986...................................................... 8

Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) .................................................................... 17

Cityspec, Inc. v. Smith, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009)............................................. 9

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)........................................ 16

Cruz v. Coach, 202 F.3d at 572 (2d Cir. 2000)............................................................................ 11

Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013)............................................ 12

Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998) .................................................. 13

Domingues v. Barton Chevrolet Cadillac, No. 18-CV-07772 (PMH), 2021 U.S. Dist. LEXIS 29425, at *12 (S.D.N.Y. Feb. 17, 2021) ................................................................................... 12

Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir.2009)..................................................................... 14

Eastway Constr. Corp. v. City of N.Y., 762 F.2d 243 (2d Cir. 1985............................................... 8

Egelston v. State Univ. College, 535 F.2d 752 (2d Cir. 1976) ...................................................... 8

Folkerson v. Circus Circus Enterprises, Inc., 107 F.3d 754, 756 (9th Cir. 1997) ...................... 14

Gallo v. Prudential Residential Serv., 22 F.3d 1219 (2d Cir. 1994 .............................................. 8

Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ................................. 16

Harris Forklift Systems, Inc., 114 S.Ct. 367 (1993) ................................................................... 11

Jaroslawicz v. Seedman, 528 F.2d 727, 731 (2d Cir. 1975) ........................................................ 8

Khan v. Hip Centralized Lab. Servs., Inc., 2008 WL 4283348, *4 (S.D.N.Y. Sept. 17, 2008) ... 17

McIntyre v. Manhattan Ford, et al., 175 Misc.2d 795 (N.Y. Co. S. Ct. 1997). ........................... 11

Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985) ............................................................................... 9

Mendez-Nouel v. Gucci Am., Inc., 542 F. App'x 12, 13 (2d Cir. 2013) ...................................... 12

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 69 (1986) ....................................................... 11

Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010)). ...................... 12

Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766-67 (2d Cir. 1998) ................................... 13

Montana v. First Fed. Sav. & Loan Ass'n., 869 F.2d 100 (2d Cir. 1989 ...................................... 9

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002)................ 10

Peries v. N.Y.C. Bd. of Educ., 97 CV 7109 (ARR), 2001 U.S. Dist. LEXIS 23393, at *16 (E.D.N.Y. Aug. 6, 2001)........................................................................................................... 14

Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) ........................................ 17

Richardson v. New York State Dep't of Corr., 180 F.3d 426, 441 (2d Cir.1999) ........ 11,14, 16,17

Saleh v. Pretty Girl, Inc., 2012 WL 4511372, at *12 (E.D.N.Y. Sept. 28, 2012)........................ 14

Schoenbaum v. Firstbrook, 268 F. Supp. 385 (S.D.N.Y. 1967...................................................... 9

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)...................................................... 17

Susko v. Romano's Macaroni Grill, 142 F. Supp. 2d 333, 338 (E.D.N.Y. 2001)........................ 15

Tomka v. The Seiler Corporation, 66 F.3d. 1295, 1305 (2d Cir. 1995) ...................................... 11

Univ. of Tex. Sw. Med. Ctr. V. Nassar, 133 S.Ct. 2517, 2533 (2013) ........................................ 16

Varno v. Canfield, 2016 U.S. App. LEXIS 20009, at *2 (2d Cir. 2016) ....................................... 9
Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78-79 (2d Cir. 2015) ............................ 9
Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878 (1994) ...................................................... 8

Statutes
29 U.S.C. § 626(d)(2) ...................................................................................................... 9
42 U.S.C. § 2000e-5(e)(1 ................................................................................................ 9
Title VII of the Civil Rights Act of 1964 ......................................................................... 1

Regulations
EEOC Guidelines, 29 C.F.R. §1604.11(b) ........................................................................ 11
29 CFR 1604.11 .............................................................................................................. 13

## PRELIMINARY STATEMENT

Plaintiff, Cynthia Ball ("Ball"), an employee of Defendant Marriott International, Inc. ("Marriott"), filed a complaint against Marriott on November 15, 2019, alleging that she was subjected to unlawful discrimination and a hostile work environment based upon her gender due to sexual harassment, as well as retaliation during the course of her employment, in violation of Title VII of the Civil Rights Act of 1964.  Discovery has concluded and Defendant moves for Summary Judgment in its entirety. Plaintiff submits this memorandum of law in opposition to Defendants Motion for Summary Judgment.

As demonstrated by Plaintiff's Rule 56.1 Counterstatement, Affidavit of Cynthia Ball, Declaration of Matthew Marks, and the Exhibits attached thereto, as well as the arguments set forth below, Defendant's motion fails to meet the standard necessary to warrant a granting of summary judgment as genuine issues of fact exist upon which a reasonable juror finding that Defendant engaged in unlawful discrimination and retaliation.  Accordingly, Defendant's motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

On February 4, 2003, Ball was hired by Defendant to work at their Westin New York Times Square Hotel (the "Hotel"). (Ruiz Decl ¶ 9, Ball 56).[1]  Ball was hired as a server and currently works for Defendant in the Foundry Kitchen and Bar (the "Foundry").  (Ruiz Decl ¶ 10).

Sometime around 2010, Ball was serving three (3) men.  (Ball 69-70).  One of them deliberately knocked his wine glass off the table, spilling wine on the floor.  (Ball 70).  Ball bent down on her knee to pick up the glass when one of the men opened his legs, pointed to his crotch

---

[1] Hereinafter, citations to deposition testimony will be identified as follows: ([Last name of deponent][page number]). All relevant depositions cited to are attached to the declaration of Matthew Marks.

and smiled at Ball (Ball 70).   Ball reported the incident to the manager at the time Mauro Villacreses ("Villacreses").   (Ball 70).   Villacreses responded to Ball's complaint by telling her, "You work in a bar.   What did you expect," and took no further action regarding Ball's complaint of sexual harassment.   (Ball 70).   Ball also reported the incident to one of Defendant's security agents, who also took no action that Ball is aware of.   (Ball 71).   Ball did not report the incident to any other management because she felt discouraged and unsupported by her manager, Villacreses.   (Ball 74).

On October 18, 2016, a customer who was staying at the Hotel was being served by the bartender.   (Ball 75).   Ball advised the bartender that he should not serve the customer anymore as he was intoxicated, but the bartender continued to serve him.   (Ball 75, 116).   Later on, that customer pushed Ball up against a wall, began stroking her face and told her that she needs to "live her life."   (Ball 75-76).   Ball immediately complained to manager Alex Fish ("Fish").   (Ball 76).   The only action Fish took was to stand between Ball and the customer as Ball continued to try and work.   (Ball 76-77).   Fish did not ask Ball what exactly happened.   (Ball 76).   Fish decided not to have the guest removed because "he was not harmful."   (Def. Ex D).   Although security was called, they did not arrive for 20 minutes.   (Ball 84, Def. Ex. E).   When Ball finished her shift, the customer was still in the Foundry and had not been removed.   (Ball 78). Despite not asking Ball what happened, Fish later told Ball that he did not know that the customer was doing anything to Ball.   (Ball 118-119).

The next day, Ball complained to Wanda Filion ("Filion"), the Hotel's then Director of Human Resources.   (Ball 78-79).   When meeting with Filion, Ball described the harassment from the night before and asked if she should write a report.   (Ball 80).   Ball also emailed Filion asking for advice as to whether she should complete an incident report regarding the harassment she experienced.   (Ball 88; Def. Ex. Denner B).   Ball wanted advice from Filion because early in

her career at the hotel, she complained about sexual harassment from a manager and was terminated days later.  (Ball 90-91).  However, her union was able to have her rehired after this retaliatory termination.  (Ball 92).    While Filion apologized for what happened to Ball, she did not answer Ball's questions regarding an incident report and did not request that Ball complete same.  (Ball 80, 97).  This harassing guest was allowed back in the Hotel and the Foundry, as Ball served him drinks several months later.  (Ball 97).

On September 10, 2017, Ball was working, and every time she passed a particular table, the men at the table would fake cough into their hands and say the word "pussy" at Ball.  (Ball 99).  Ball complained to Glenn Brown ("Brown"), an interim manager, and in response to Ball's complaints, he merely shrugged at her.  (Ball 99).  Ball then had the bartender call security.  (Ball 99-100).  While waiting for security one of the male patrons stood up and began poking Ball in her chest.  (Ball 100).  At that point security associate James Johnson ("Johnson") appeared.  (Ball 100).  When Ball explained the situation, Johnson told her, "I got your back." (Ball 100).  However, not only did Johnson not speak with the harassing patrons, but when Ball turned around after getting drinks at the bar, he had already left the Foundry.  (Ball 100-01).

The next day, Ball sent an email to Zoe Cohen ("Cohen"), Director of Restaurants and Bars and Kerry Davis ("Davis"), Ball's direct supervisor, the then Food and Beverage Manager, asking to discuss the harassment from the night before.  (Ball 102, 104; Davis 11).  That day Ball met with Cohen and Davis and explained what happened and Brown's response to Ball's complaints.  Although Cohen offered to speak with Brown, Ball declined, expressing concern that she still had to work with him alone for the next two (2) nights.  (Ball 110).  As far as Ball was made aware, Defendant took no further action in response to this harassment, nor Brown's inappropriate response.  (Ball 111).  Despite all of these incidents, Defendant did not have a security member regularly posted to the Foundry.  (Davis 15-16).  In fact, Davis, despite being

the Food and Beverage Manager, does not know if security guards went to the Foundry as part of their regular duties.  (Davis 16).  These security guards worked throughout the Hotel, which has 873 rooms.  (Davis 16, 18).  Moreover, at the time, Defendant did not have a policy or procedure as to when guests should be removed from a bar.  (Davis 29).

On September 18, 2017, Ball was working when she was again sexually harassed.  (Ball 111).  While working, Ball went to the bar to pick up drinks and a customer put his hand on her right buttock and squeezed and felt "fingers go between my buttocks."  (Ball 124, 126-27, 176; Def. Ex. G at 7:46 – 7:50). After pausing for a moment because she was "totally thrown," Ball went to speak to Davis and explain that she had just been assaulted.  (Ball 125, 128).  Davis asked if it was an accident, and Ball explained that it was intentional.  (Ball 125, Davis 20). Davis did not act in any way as if what happened to Ball was wrong or inpropriate. (Ball 148). Davis' blasé reaction caused Ball to momentarily wonder if she was "making a big deal out of nothing," even though she knew she was not.  (Ball 149).  Ball began to cry and Davis suggested that Ball get some air, and that she would cover Ball's tables.  (Ball 125, 135).  Ball assumed that Davis would call security.  (Ball 132).   Ball intended on informing security about her assault on her way to get air.  (Ball 132).  However, security does not necessarily show up when they are called.  (Ball 132).  Moreover, Ball's assaulter came back to the Foundry later that same evening. (Ball 199-200).  At the time, according to Davis, Defendant did not have a policy or procedure in place in a worker made a complaint that a guest behaved inappropriately in a sexual manner. (Davis 22-23).

Ball then ran into her friend, Security Associate Allen Israel ("Israel") and explained that she had just been sexually harassed.  (Ball 125, 149).  Israel told Ball that she should file a report and asked her to meet him in the cafeteria. (Ball 125).  When Ball met Israel in the cafeteria, Ball explained what happened.  (Ball 125).  While Ball was meeting with Israel in the cafeteria, she

noticed Davis, who was supposed to be covering her tables, eating.  (Ball 137, 151).    Ball then went into the bathroom to throw up due to the stress of the incident and left work early.  (Ball 126).   The next day, Ball wrote an email to Maria Lavides ("Lavides), human resources, explaining that this customer put his hand "really up in my areas," as his fingers went in between her buttocks.  (Ball 147; Pl. Ex. A).

Domiick Franzo, the bartender that evening said that the assailant collided with Ball, but his view was obstructed by the bar, as he was on the other side of it.  (Defendant Ex. K, Ball 129; Def. Ex G at 7:46 - 7:50.)**.**  In the Foundry where the assault happened, there are two (2) video cameras.  (Ball 129).   Defendant's own Food and Beverage Manager at the time does not know how many cameras are in the Foundry.  (Davis 30).

The next day, Ball wrote to Lavides as she was out of sick days but not well enough to work due to the trauma of the assault.  (Ball 138).  Lavides permitted Ball to take two (2) days off on FMLA leave.  (Ball 138, 157).    Her doctor found that Ball suffered from "emotional trauma."  (Pl. Ex. B).

Either the day after the assault or the following day, Lavides told Ball that no one else witnessed her assault.  (Ball 164, 165).  A few days later, Ball contacted the police, and met with Detective Rosita Williams ("Williams").   (Ball 167-68).   This was the only incident Ball contacted the police while working for Defendant.  (Ball Aff ¶ 3).  Ball told Williams that she was grabbed in the buttock at work.  Williams took a report from Ball and went to Defendant to view the video of the assault.  (Ball 169).    Williams advised Ball that Defendant would not allow her to view the videotape the first two (2) times that she went there, and on the third visit, although they allowed to her view the video Defendant refused to provide a copy and instead made Williams record the video on her cell phone.  (Ball 169).    Ball also asked Lavides for a copy of the video, but Lavides would not provide her with it.  (Ball 195; Def. Ex. N).

Ball went to her union office to complain about the above sexual harassment.  (Ball 193).
She was informed that the union would investigate but they never responded further to Ball.
(Ball 1923-94).  Ball contacted her union and asked if they could assist her with finding a sexual
harassment lawyer for this matter, but they told her that they would not represent her.  (Ball 192).
After their lack of a response, Ball did not follow up with the union any further.  (Ball 192).

Ball first viewed the video of her assault within the week of her assault in Defendant's
Human Resources Office with Lavides, Sean Cassidy ("Cassidy"), then Hotel Manager, and her
union agent, Marie Richard ("Richard").  (Ball 130).  While watching the video Richard gasped.
(Ball 131).    Lavides asked if her assailant apologized and Ball said that he did not apologize.
(Ball 131, 175).    There was another camera pointed directly at Ball's backside, whose video
was not shown to Ball.  (Ball 208).  Ball asked Lavides for a copy of the video of her assault but
Lavides would not provide her a copy.  (Ball 195).

Sometime after Ball's last assault, Defendant installed panic buttons.   (Ball 196).
However, the panic buttons did not work.  (Ball 196).  Ball complained to security associate
Julian Biba ("Biba") that she tried to use the panic button but it did not work.  (Ball 198; Pl. Ex.
C).  Biba told her that they were not working.  (Ball 198).  Ball asked a Security Manager,
Cheryl Darcy, about whether the panic buttons were working, and she replied, "no, not yet."
(Ball 198).  Sometime thereafter, Defendant removed one of the two (2) panic buttons in the
Foundry.  (Ball 209). On December 11, 2021, Cynthia Jeffries, manager, attempted to use the
panic button when someone was bothering guests in the Foundry but they still did not work.
(Ball Aff. ¶ 5).   On October 17, 2017, Ball, through counsel, complained of the hostile work
environment to which she was being subjected.  (Pl. Ex. D).

In May 2018, Franzo left his bartender position, opening up a bartender position at the
Foundry.  (Ball 217; Ruiz Decl., ¶ 25).  The bartender position pays more than Ball's server

position.  (Ball Aff ¶ 4).      Ball applied for the position before the application deadline passed.  (Ball 217).  Ball has significant bartending experience, working for many years as a bartender.  (Ball 45).  She was a bartender at the Crowne Plaza Hotel for almost four (4) years.  (Ball 44-45).  She also worked for several years as a bartender in several locations in Buffalo.  (Ball 45-51).  Ball informed Davis that she was interested in applying for the position.  (Ball 218).  Davis told Ball she would take her to human resources immediately about the position, which she did.  (Ball 218).  Upon arriving at human resources, Davis and Daniel Brauer ("Brauer") from human resources interviewed her on the spot.  (Ball 218).  During the interview Brauer asked Davis if she had any questions for Ball and Davis said that she did not, as she already knows how hard Ball works.  (Ball 229).  After interviewing with Davis and Brauer, Ball interviewed for the position with Cassidy, Hotel Manager, and completed an online application form.  (Ball 219).  Davis, Cassidy and Bower were all enthusiastic about Ball applying.  (Ball 229).

A few weeks later, Defendant asked Ball to complete a test about how to make drinks.  (Ball 220).  However, the written test was flawed as the answers incorrectly stated that "Wild Turkey" is not a bourbon and answers were inconsistently scored as some applications received credit   for   identifying   Chambord   as   raspberry   liquor   and   others   were   not.  (https://www.wildturkeybourbon.com/products/;                https://www.chambordliqueur.com/our-magnifique-process/).  Moreover, Ball lost points on this test for stating that 1.5 ounces is the correct amount of whiskey in a whiskey sour, which is correct.  (Miller Decl., ¶ 9, Ex. B; https://www.crownroyal.com/whisky-cocktails/whisky-sour;   https://www.bulleit.com/whiskey-drinks/whiskey-sour/;   https://threemanycooks.com/conversations/real-whiskey-sour-official-drink-summer/).  Had this answers been correctly scored, she would have received a 27 out of 30.  (Miller Decl., ¶ 9, Ex. B).

Defendant hired Alfredo Tapia ("Tapia") for the bartender position.  (Ball 221).  Tapia scored a 27 on his test.  (Miller Decl., ¶ 10, Ex. C).  Tapia had limited experience in a bar, working in a bar on and off for the past year.  (Pl. Ex. D)**.**  Tapia was rated by his manager at Defendant as "less than acceptable" with respect to his "professional demeanor.  (Pl. Ex. E).  Ball was informed by the then food and beverage director for the Hotel, Christopher Miller, who told Ball that he was sorry, and he knew that Ball would be better with the guests that Tapia. (Ball 221).  When Ball explained to Davis that she was unhappy that she did not receive the bartender position, Davis responded by telling ball that he was more serious about it, because he had a bar tattoo on his arm.  (Ball 221-22).  Tapia did not know how to make several basic drinks, including a Brandy Alexander and an Old Fashioned.  (Ball 222).

## LEGAL ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

The granting of a summary judgment motion is a drastic remedy which must be used "sparingly," because it has *res judicata* effect and deprives the litigant of his/her day in court and his/her opportunity to cross-examine the movant and movant's witnesses. *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219 (2d Cir. 1994); *Egelston v. State Univ. College*, 535 F.2d 752 (2d Cir. 1976); *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243 (2d Cir. 1985), *cert. denied*, 484 U.S. 918 (1987).  As a result of the drastic nature of summary judgment, the judicial standard applied in granting the motion is narrow as the motion must be denied if, any genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986). Additionally, the court must carefully scrutinize the proofs submitted in the light most favorable to the non-movant and accord the non-movant the full benefits of all favorable inferences that may be drawn from the evidence. *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994).  If

there is any doubt as to the existence of a triable issue of fact or if a material issue of fact is arguable, summary judgment must be denied. *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir. 1975). Additionally, all inferences must be drawn in favor of the non-moving party. *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009).

In employment discrimination cases where a defendant's intent is at issue, the Second Circuit has held that the district court "must be cautious about granting summary judgment to an employer." *Montana v. First Fed. Sav. & Loan Ass'n.*, 869 F.2d 100 (2d Cir. 1989); *see also Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 448 (2d Cir. 1999) ("as discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for reasons expressly forbidden by law"); *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985). Moreover, fact issues, including those involving witness credibility and inconsistencies in the opposing parties' summary judgment papers and proofs, can only be resolved at trial. *American Mfrs. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967). The District Court's role on a summary judgment motion is limited to issue finding only, not issue resolution. *Gallo*, 22 F.3d at 1219; *Jaroslawicz*, 528 F.2d at 727. Thus, if the movant's papers depend heavily upon the credibility of witnesses, the motion must be denied. *American Mfrs. Mutual Ins. Co.*, 388 F.2d at 284-85; *Schoenbaum v. Firstbrook*, 268 F. Supp. 385 (S.D.N.Y. 1967), *aff'd in part, rev'd in part on other grounds*, 405 F.2d 215 (2d Cir. 1968), *cert. denied*, 395 U.S. 906 (1969).

## II.    PLAINTIFF' CLAIMS ARE TIMELY

### A.    Timely Claims

Under Title VII, a plaintiff must file a complaint with the Equal Employment Opportunity Commission ("EEOC") within 300 days of a discriminatory act. Varno v. Canfield, 2016 U.S. App. LEXIS 20009, at *2 (2d Cir. 2016); citing 29 U.S.C. § 626(d)(2); 42 U.S.C. § 2000e-5(e)(1); see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78-79 (2d Cir. 2015).  As a result, as Defendant acknowledges, all acts that occurred on or after April 30, 2017 are timely, as this is 300 days prior to the filing of Plaintiff's complaint with the New York State Division of Human Rights, which was cross-filed with the EEOC.

### B.    Continuing Violation and Background Evidence

Plaintiff was also subjected to actions creating a hostile work environment that took place outside of the statutory time period.  These events are used as background evidence and as part of Plaintiff's hostile work environment claims.  The seminal Supreme Court case regarding statute of limitations in employment discrimination cases is *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002).  In *National Railroad*, the Court clearly held that acts outside the statute of limitations can be used as evidence to support timely claims. *National Railroad*, 122 S.Ct. 2061, 2072 (2002) (holding that the statute of limitations does not "bar an employee from using the prior acts as background evidence in support of a timely claim.").  More importantly, the Supreme Court also held that a continuing violation theory exists in hostile work environment claims.  *National Railroad*, 122 S.Ct. at 2075, 2077.  Indeed, the Court clearly stated that, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile work environment takes place within the statutory period." *National Railroad*, 122 S.Ct. at 2068.

Plaintiff alleges specific and related discriminatory events which occurred, between 2010 through September 18, 2017, which are prior to April 30, 2017.  These events were part of an

ongoing hostile work environment, as evidenced by the fact that they involve Ball being sexual harassed and Defendant doing little to nothing to prevent such harassment.

Though some of these events occurred prior to April 30, 2017, they evidence Defendant's ongoing policy of permitting Ball to be sexually harassed.  These are specific and related instances of discrimination which Defendant allowed to continue unremedied, such that it amounts to a discriminatory policy or practice, and cannot be said to constitute discreet acts.  Thus, these events are actionable pursuant to the continuing violations theory.  Conversely, to the extent these events are not actionable, they are admissible as background evidence to establish liability for acts which occurred within the limitations period and the unreasonableness of Defendant's responses.

### III.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS

Hostile work environment claims are set forth when a plaintiff has alleged that an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *Tomka v. The Seiler Corporation*, 66 F.3d. 1295, 1305 (2d Cir. 1995).  A hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' ... that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment'." *Id.* at 1305 (quoting *Harris Forklift Systems, Inc*., 114 S.Ct. 367 (1993)).

In order to set forth a *prima facie* case for a hostile work environment, a plaintiff must prove, *inter alia,* that (1) she was in a protected class; and that the alleged harassment (2) was severe or pervasive such that it altered conditions of employment; (3) was unwelcome; and, (4) was based on Plaintiff's status as a member of the protected class. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) (*quoting* EEOC Guidelines, 29 C.F.R. §1604.11(b)); *McIntyre v. Manhattan Ford, et al.*, 175 Misc.2d 795 (N.Y. Co. S. Ct. 1997).

In order to evaluate any hostile work environment claim, it is critical to consider the totality of circumstances, which includes all of the facts alleged, so as to obtain a realistic view of the work environment. *Cruz v. Coach*, 202 F.3d at 572 (2d Cir. 2000); *Richardson v. N.Y.S. Dept. of Corr. Serv.*, 180 F. 3d 426 (2d Cir. 1999). Even a single incident can be enough to create a hostile work environment. *Cruz v. Coach*, 202 F.3d at 571 (noting that the use of a racial slur, even on one occasion, can constitute a hostile work environment based on race).

"A plaintiff may establish the "severe or pervasive" element of a hostile work environment claim by identifying either "'a single incident [that] was extraordinarily severe or [] a series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *Domingues v. Barton Chevrolet Cadillac*, No. 18-CV-07772 (PMH), 2021 U.S. Dist. LEXIS 29425, at *12 (S.D.N.Y. Feb. 17, 2021)(Quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) To establish the "severe or pervasive" element of a hostile work environment claim, a plaintiff does not need to show that his "hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions." *Mendez-Nouel v. Gucci Am., Inc.*, 542 F. App'x 12, 13 (2d Cir. 2013)(Quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)).

Here, the totality of the circumstances, viewed in a light most favorable to Plaintiff are that Ball was subjected to a hostile work environment, looking at the totality of the circumstances. Despite Defendant's arguments to the contrary, the September 18, 2017 incident is severe enough by itself to constitute a hostile work environment. The customer in question squeezed Ball's right buttocks and put his fingers between her buttocks. Crediting Ball's testimony, which if true constitutes an assault, is certainly severe enough under *Cruz* as to constitute a hostile work environment. This is especially so when, combined with the September

10, 2017 incident, in which Ball was subjected to sexually charged comments.  While Defendant attempts to have these incidents each viewed in a vacuum, when looking at the totality of the circumstances, Ball has established that she was subjected to a hostile work environment.

Defendant's reliance solely on the video recording and Franzo's statement is unavailing. The video is not of quality to determine whether, as Ball has repeatedly stated, that her right buttock was squeezed or that her assailant's fingers went in between her buttocks.  Similarly, Franzo's view is blocked by the bar and he was not in a position to see if this occurred they way Ball has repeatedly stated and testified.   As such, should a jury credit Ball's testimony, Ball meets both the objective and subjective standard to create a hostile work environment.

Similarly unpersuasive is Defendant's argument that Ball's actions are inconsistent with someone who was sexually assaulted.  A reasonable juror certainly understands that there is no single way that a victim of sexual assault acts.  Ball was, in her own words, "totally thrown" by the trauma of the assault.  While at times Ball questioned herself, she when doing so also wondered if Defendant was "gaslighting" her, and she knew that she was not "making a big deal out of nothing."   Moreover, this was the only incident which Ball felt compelled to call the police.[2]  Shortly after the incident, Ball thew up.  Despite not having any sick days left to use, she was unable to come into work the next two (2) days.  Her doctor found Ball to be suffering from emotional trauma.  Given the circumstances as a whole, a reasonable juror could find that Ball's actions were consistent with a sexual assault and that she was subjected to a hostile work environment.

---

[2] While Defendant claims that the police found no evidence of sexual assault, they offer no evidence for this contention aside from the fact that charges were not brought in this matter.

### III.   DEFENDANT LIABILITY UNDER TITLE VII

In order to prevail on a hostile work environment claim, a plaintiff must show a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998). "'An employer *may []* responsible* for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer . . . knows or should have known of the conduct and fails to take immediate and appropriate corrective action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766-67 (2d Cir. 1998)(Quoting 29 CFR 1604.11).   "*In reviewing these cases the [EEOC] will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees*.") *Id.* (emphasis in original). See also *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) (holding that "an employer may be held liable for sexual harassment on the part of a private individual, such as the casino patron, where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct"). *See also Peries v. N.Y.C. Bd. of Educ.*, 97 CV 7109 (ARR), 2001 U.S. Dist. LEXIS 23393, at *16 (E.D.N.Y. Aug. 6, 2001)

An employer is liable for a "hostile work environment created by [a non-supervisor] if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Saleh v. Pretty Girl, Inc.,* 2012 WL 4511372, at *12 (E.D.N.Y. Sept. 28, 2012); *see also Distasio*, 157 F.3d at 64 ("[W]hen the harassment is attributable to a co-worker, rather than a supervisor . . . the employer will be held liable only for its own negligence."). This standard requires a plaintiff to show that "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable."

*Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir.2009). Plaintiff has the burden of proving that Defendants were "negligent, that is, [ ] it either 'provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 441 (2d Cir.1999). Here, Defendant argues that Ball cannot show that it acted unreasonably, which is addressed below.

### A. **DEFENDANT ACTED UNREASONABLY**

An employer who has actual or constructive knowledge of a hostile work environment must take reasonable steps to remedy the harassment. *Susko v. Romano's Macaroni Grill*, 142 F. Supp. 2d 333, 338 (E.D.N.Y. 2001). The reasonableness of the company's response must be analyzed in light of the totality of the circumstances. *Id.* The Second Circuit has indicated that the factors to be considered in determining the reasonableness of the response include "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.*

Defendants did not act reasonably with respect to Ball's complaints. Prior to the September 18, 2017 assault, Ball complained on at least three (3) separate occasions about being sexually harassed by customers. Defendant failed to take any action in response to these complaints or to prevent the further sexual harassment of Ball by customers. As a direct result of Defendant's failure to take any action, reasonable or otherwise, a customer sexually assaulted Ball on September 18, 2017. As such, it cannot be said that Defendant's actions were reasonable.

Defendant's actions after the September 18 assault further show its failure to take reasonable action. Defendant was, at best, reluctant to assist the police detective investigating this matter. It refused to provide Ball with a copy of the video of the incident. Moreover,

although Defendant installed "panic buttons," it is clear that these buttons were no more than a meaningless gesture, as opposed to an actual response as they did not even work, and still do not work.   Defendant attempted to give the appearance of doing something, without actually doing anything to prevent Ball from being sexually harassed.   While Defendant touts the fact that Ball was not been harassed since then, it must be noted that she was not at work for a year and ten (10) months of that time due to an injury and the pandemic.   As such, it cannot be said that Defendant acted immediately, timely or appropriately.

## II.   PLAINTIFF'S RETALIATION CLAIMS

[T]o establish a *prima facie* case of retaliation under Title VII, , an employee must show that: "(1) [s]he was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer."   *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).   Additionally, when a defendant proffers an alleged legitimate business reason for the adverse actions it took against the plaintiff, it is incumbent upon plaintiff to then demonstrate that this reason is pretextual in nature, and that, but-for the unlawful retaliation, Plaintiff would not have been subjected to the adverse actions to which she was subjected.   *See Richardson*, 180 F.3d at 443; *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S.Ct. 2517, 2533 (2013).   Here, Defendant disputes that Plaintiff can establish casual connection and that that it had a legitimate business reason for not hiring her for the position of bartender.   These arguments will be addressed below below.

**A.      Causal Connection/Pretext**

A plaintiff may establish the causal connection in one of several ways.  *Borrero v. Collins Bldg. Services, Inc.*, 2002 WL 31415511, at *15 (S.D.N.Y Oct. 25, 2002).  First, plaintiff may present "evidence of retaliatory animus directed against the plaintiff [to] establish the causal connection directly."  *Id.* (citations and internal quotation marks omitted).  It is well established that the "causal connection needed for a proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)(internal quotations omitted); *see also Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999) (holding one month between protected activity and adverse action establishes causal connection); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (two months between protected activity and adverse employment action establishes causal connection); *Khan v. Hip Centralized Lab. Servs., Inc.*, 2008 WL 4283348, *4 (S.D.N.Y. Sept. 17, 2008) (temporal proximity of six weeks "is sufficiently close to allow the jury to find that the [adverse employment action] was retaliatory").

Additionally, the falsity of an employer's proffered reason is sufficient evidence for a reasonable juror to infer that the employer's proffered reason is pretext for intentional retaliation. *See Reeves,* 530 U.S. at 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination").  With respect to the NYCHRL retaliation, the falsity of an employer's proffered reason compels the denial of summary judgment.  *See Bennett v. Health Management Sys., Inc.*, 936 N.Y.S.2d 112, 123 (2d Dept. 2011).  As the court held in *Bennett*:

> Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to coverup the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances. Proceeding in this way reaffirms the principle that trial courts must be especially chary in handing out summary judgment in anti-discrimination cases, because in such cases the employer's intent is ordinarily at issue.

*Id.* (internal citations and quotations omitted). While this case does not have precedential impact on Title VII claims, it is persuasive and logical that if a juror believes that one of the reasons for Plaintiff's termination was fabricated, a jury could find pretext.

Plaintiff can establish a causal connection through the timing and sequence of events, as well as through the pretextual nature of the actions taken against Plaintiff. As detailed above, Ball complained about the hostile work environment in October. In May Defendant passed her over for the bartender position. In selecting Tapia for this position, Defendant hired someone with vastly less experience and whose professional demeanor was rated as "less than acceptable" by Defendant. Moreover, Tapia did not know how to make basic drinks.

Defendant's proffered legitimate business reason, that Tapia scored higher on a multiple-choice test by a single point, is nothing more than pretext for its retaliation of Ball. Defendant attempts to argue that in selecting for the bartender position, it ignored the interview process (which Defendant concedes both Ball and Tapia performed well in their interviews), the vast experience difference between the Ball and Tapia in favor of Ball, and Tapia's negative rating with respect to his professional demeanor. Instead, it argues, it decided to solely rely upon a multiple choice test, and it is only coincidence that this is the only metric by which Tapia can be rated better than Ball (by a single point). This explanation is implausible.

Moreover, as detailed above, the test Defendant relied upon was completely flawed. It failed to give credit to everyone for a correct answer regarding whether Wild Turkey was a bourbon, and more importantly, Defendant failed to give Ball answer for a correct answer

regarding the ingredients for whiskey sour.  Had Defendant properly scored Ball's text, she would have achieved the same score as Tapia.

As such, given the timing and sequence of events, coupled with Defendant's pretextual hiring process, a reasonable juror could find Defendant's alleged legitimate business reasons for their actions to be nothing more than pretext for retaliation and that Ball's complaints of discrimination were a but for cause of her not receiving the bartender position.  Plaintiff has raised material questions of fact as to whether Defendant engaged in conduct against Ball that was reasonably likely to deter a person from engaging in protected activity.

## **CONCLUSION**

For the reasons discussed herein, defendant's motion for summary judgment should be denied in its entirety.

Dated: Long Island City, New York
            December 20, 2021

Respectfully submitted,

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 11101

By:_____/s_____
        Matthew I. Marks