UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
: 
CYNTHIA BALL,                                                     :
:
                              Plaintiff,                          :
:
                      -v-                                         :
:
MARRIOTT INTERNATIONAL, INC.,                                    :
:
                              Defendant.                          :
:
-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/12/2022__
```

19-cv-10593 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Marriott International, Inc. ("Defendant" or "Marriott") moves, pursuant to Federal Rule of Civil Procedure 56, for an order granting it summary judgment and dismissing the complaint of Plaintiff Cynthia Ball ("Plaintiff" or "Ball") for employment discrimination and retaliation.  Dkt. No. 58.

For the following reasons, the motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed for the purposes of the summary judgment motion except where otherwise indicated.

Ball began her employment with Defendant at the Westin New York at Times Square Hotel (the "Hotel") on February 4, 2003.  Plaintiff's Counterstatement of Undisputed Facts, Dkt. No. 68 ¶ 6.  She was initially hired as a cocktail server.  *Id.* ¶ 7.  When she was hired, she became a member of a union, and she eventually became a union delegate.  *Id.* ¶ 14.  Ball is currently a server at the Foundry Kitchen & Bar (the "Foundry").  *Id.* ¶ 15.  She has not been suspended or demoted since September 18, 2017, and her salary has not been reduced since that time, *id.*, but like all other employees at the Foundry, she was laid off for a period of time as a

result of the COVID-19 pandemic, *id.* ¶ 16.  Since July 7, 2021, she has been recalled to active

duty.  *Id.*  Ball alleges that she was subject to sexual harassment on multiple occasions while

working at the Foundry.

## I.      October 18, 2016 Incident

On October 18, 2016, Ball was working as a server at the Foundry.  *Id.* ¶ 17.  Ball

testified that, that at 10:45 or 10:50 p.m. that night—shortly before her shift ended at 11:00

p.m.—a customer who was "obviously drunk" pushed Ball up against a wall, started stroking her

face, and told her "you have to live your life."  Dkt. No. 72-1 at 75–76; 118; *see also* Dkt. No. 68

¶ 18.  She then "scrammed away" from the customer and told her supervisor, Alexander Fish, "if

you do not get [the customer] away from me, I am going to kill him."  *Id.* ¶¶ 18–19.  In response,

Fish stood between Ball and the customer—effectively blocking the customer from coming into

contact with Ball—while Ball finished up her work for the night.  *Id.* ¶ 20.  Fish told a security

manager, Steven Fisher, about Ball's complaint, but by the time Fisher arrived at the bar, the

customer had gone up to his room, and Ball's shift had ended.  *Id.* ¶ 23.

The following morning, October 19, 2016, Fish emailed his supervisor, Zoe Cohen, who

was the Director of Restaurants and Bars, to report what occurred the previous night.  *Id.* ¶ 24.

Fish wrote:

> The guest in [REDACTED] was intoxicated last night in the bar.  He was very
> talkative with guests and associates a like.
>
> We were not serving him any more drinks; however, I did not find it necessary to
> have him removed as he was not harmful
>
> At around 10:45–10:50 Cindy felt that Mr. [REDACTED] was getting to[o] close
> and hugging her.  She felt uncomfortable by him.
>
> I told her I would let security know this.  By the time security came, Mr.
> [REDACTED] already went back to his room for the evening.
>
> Cindy's shift was over at 11, and was going home.

Dkt. No. 62-4 at 3.  Ball also sent a text message to Cohen that day, asking to talk.  Dkt. No. 68

¶ 25.  Cohen had poor cellular service and responded to Ball saying her service was "spotty," *id.*

¶ 26, and Ball replied that she would see Wanda Filion, Human Resources Director, before Ball's

shift started, *id.* ¶ 27.  Cohen also responded to Fish's email, stating:

> To keep you in the loop – I am at Cornell recruiting, but Cindy texted me that she
> wanted to talk because she was upset about something that happened last night.  I
> called her twice and left two voicemails and she never responded.  She then texted
> me that she would see Wanda before her shift.  I believe it is about the below.

Dkt. No. 62-4 at 3.

Ball also sent Filion an email that same day, asking to meet.  Dkt. No. 68 ¶ 28.  Ball

wrote:

> Something happened last night at the end of my shift.  I was advised by another
> employee to fill out an incident report but I would like your advice before doing so.
>
> Tried to reach Zoe first but she is away and has spotty cell service.
>
> I have an appt until 2 today, can be at work at 2:15 but I start at 3 and really need
> to be on the floor at that time.
>
> If we can meet at 2:15 until 2:45 can you text me b/c as I will be out I will be unable
> to reach my email.

Dkt. No. 64-2 at 3.  Ball and Filion met later that day to discuss the events of October 18, 2016.

Dkt. No. 68 ¶ 29.  Ball testified that, when she met with Filion, Ball "said should I write a

report" but Filion "did not say yes or no" and did not remember what Filion said in response to

Ball's request for advice, just remembering "that [Filion] didn't say to fill out a report or not.

She did not encourage me to fill one out."  Dkt. No. 72-1 at 80.  Filion made notes of the

meeting.  Dkt. No. 68 ¶ 29.

The guest checked out of the Hotel on October 20, 2016; as a result of her complaint,

Ball was informed she did not have to serve him again.  *Id*. ¶ 30.

## II.       September 10, 2017 Incident

On September 10, 2017, Ball was working at the Foundry.  *Id.* ¶ 31.  Two men and two women were sitting at a table, and when Plaintiff walked by the table, she heard the men cough into their hands the word "pussy."  *Id.*  Ball complained to the interim manager on site that day and asked the bartender to call security.  *Id.* ¶ 32.  One of the customers asked Ball to bring them shots of alcohol and the check while poking Ball in the chest.  *Id.* ¶ 33.  A security officer then appeared, and Ball told him that she had a problem with the customers and asked him for help, *id.* ¶ 34; the security officer responded, "I got your back," *id.*  Ball went to the bar to get the customers their shots, and when she returned with the drinks, the security guard was gone.  *Id.* ¶ 35.  Ball testified that the security guard did not speak to the customers and just "disappeared" after he talked to Ball.  Dkt. No. 72-1 at 100–01.  The customers paid their check and left the Foundry without further incident.  Dkt. No. 68 ¶ 35.

The next day, Ball emailed Cohen and Kerry Davis, Restaurant Manager, asking to meet. *Id.* ¶ 36.  Ball, Cohen, and Davis met that day, September 11, 2017, to discuss what had happened the previous night.  *Id.* ¶ 37.  At the meeting, Davis and Cohen stated that they were not happy to hear what had happened, *id.*, and Cohen offered to discuss the matter with the interim manager, but Ball told Cohen that she did not want her to address the matter with him, *id.* ¶ 38.  Ball testified that she said no because she "was afraid because [she] still had to work two more nights solely with him and [she] need[s] a manager's help so [she] didn't want him to take it out on [her] because he was angry."  Dkt. No. 72-1 at 110.

## III.      September 18, 2017 Incident

On Monday, September 18, 2017, Ball was working as a server at the Foundry. Dkt. No. 68 ¶ 41.  Dominick Franzo was working as the bartender and Davis was working at the Foundry as well.  *Id.*  Ball testified that, while at the bar, she felt her "buttock being grabbed" by a

4

customer and felt his "fingers go between [her] buttocks." Dkt. No. 72-1 at 124. She elaborated: "He put his hand on my right buttock and squeeze, and I felt his fingers go between the separation between the buttocks." *Id.* at 127. When asked how long the customer grabbed her for, Ball replied: "I don't know. Two seconds, three seconds." *Id.*

After being touched, Ball paused for a moment and then exited the bar area to speak with Davis, who was standing outside of the doors leading to the Hotel lobby. Dkt. No. 68 ¶ 46. Davis did not witness the touching, but Ball told her that a man "just grabbed my ass." *Id.* ¶¶ 47–48. Davis asked Ball if the touch might have been accidental, and Ball replied that it was not accidental. *Id.* ¶ 49. Davis asked Ball what she wanted to do and suggested that Ball go get some air. *Id.* ¶ 50. While Ball was speaking to Davis, the customer remained in the bar area of the Foundry. *Id.* ¶ 51. After speaking to Davis, Ball walked down the service corridor toward the bathrooms so that she could "pull [herself] together." *Id.* ¶ 57. Before leaving the bar area, Ball did not take any steps to identify the customer for Davis or for anyone else before the customer left the bar. *Id.* ¶ 60. While Ball was in the service corridor, the customer left the Foundry; Ball did not see him leave. *Id.* ¶ 58.

A video of the incident was captured by one of the security cameras at the Foundry. *Id.* ¶ 74. The video demonstrates that, at around 6:21 p.m. on September 18, 2017, a customer got up from his seat and approached the bar next to the servers' stand. *Id.* ¶ 76. Ball then approached the bar from an area occupied by the customer. *Id.* Franzo appears on the video as Ball is approaching the bar, and he points towards Ball and the customer. *Id.* ¶ 77. The parties dispute what the video shows next. Marriott states that "[a]s Mr. Franzo is looking and pointing towards her, Plaintiff bends over slightly in the area behind the patron, and when the patron turns around to leave the bar, the back of his right hand swings around and accidentally touches

5

Plaintiff's rear." *Id.* ¶ 78.  It also asserts that: "[t]he video makes clear that Mr. Franzo witnessed the interaction between Plaintiff and the patron," *id.* ¶ 79, and that "the patron appears surprised, . . . [and] Plaintiff does not act surprised at all, lingers at the bar, and then slowly walks out of the restaurant rear exit," *id.* ¶ 80.  Ball disputes these statements and says that "it is impossible to interpret how the patron or Plaintiff appear from the video," *id.* ¶ 80; she asserts that "Defendant grabbed Plaintiff's right buttocks with his hand, and put his fingers between her buttocks," *id.* ¶ 78, that "Franzo's view was obstructed by the bar" during the interaction, *id.* ¶ 79.  An independent review of the video itself shows that Ball approaches the bar next to where the customer is standing and bends over slightly while the customer turns to leave the bar without looking at Ball; as the customer turns, his hand makes contact with Ball's buttocks for approximately one or two seconds, and he walks away. Dkt. No. 62-7, Video at 7:44–7:54.  It is unclear from the video whether the touching was accidental or intentional.  Ball turns around when contact is made and then remains at the bar for about fifteen seconds before exiting the Foundry.  *Id.* at 7:47–8:07.  The parties agree about what the video shows after that.  Ball goes to speak to Davis, who is standing just outside the rear exit, and during the time Ball and Davis are speaking, Ball does not point or gesture towards the customer to identify him to Davis, despite the fact that the customer was still inside the bar. Dkt. No. 68 ¶ 81.  Plaintiff then walks towards the service stairs and Davis follows.  *Id.* ¶ 82.  While Ball remains by the service stairs, the customer leaves the Foundry.  *Id.*

Following the incident, Ball did not expressly ask Davis or Franzo, the bartender, to call security.  *Id.* ¶¶ 53–54.  She also did not call security herself or ask any others to do so, even though in the past she had asked bartenders or co-workers to call security when she had incidents with co-workers at the Foundry.  *Id.* ¶ 55.  Ball testified that she planned to tell security about the

incident on the way out of the door of the Hotel.  Dkt. No. 72-1 at 131–32.  After leaving the

service corridor, Ball went to the cafeteria and saw Allen Israel, a security officer at the Hotel.

Dkt. No. 68 ¶ 62.  Ball told Israel what happened, and he "automatically encouraged [her] to

write a report."  *Id.* ¶ 64.  Israel "was very sympathetic and concerned," *id.* ¶ 65, and

immediately alerted Security Manager Jim Reyes, who then reported to the cafeteria, *id.* ¶ 66.

Reyes asked Ball if she wanted to go to the hospital, but Ball declined.  *Id.* ¶ 67.  After meeting

with Israel and Reyes, Ball went to the women's bathroom and threw up.  *Id.* ¶ 69.  Ball was

given permission to leave work early, and she went home.  *Id.*

Israel had Ball write a statement down on an "Associate Statement" form.  *Id.* ¶ 68.  In

her statement, dated September 18, 2017, Ball wrote:

> Patron (non hotel guest) sat at rail in bar came in around 6:30.  I chatted with him
> briefly about bourbon, he asked me if I was having a good day.  I was at bar to pick
> up drinks and felt a hand come from behind and grab me between my legs.  I turn
> and see guest but was completely thrown.  I walked out of bar to report to Kerry
> Davis.  Guest left w/ friend by far exit (by elevator) not in a hury and even though
> it was obvious what he did, he did not apologize or recognize what he'd done.
>
> Left at 7:00 ish
>
> White guy about late 30s tan sweater

Dkt. No. 62-10.

After the incident, Marriott received statements from Franzo, Davis, and Israel, in

addition to Ball.  Dkt. No. 68 ¶ 70.[1]  Franzo gave a written statement dated September 18, 2017.

---

[1] In connection with this paragraph of the Rule 56.1 statement—but not others—Ball disputes
Marriott's characterization of the gathering of statements as an "investigation," pointing to a
"N/A" under the heading "Investigation/Follow Up" in the incident report prepared for this
incident.  *See id.* ¶ 70; Dkt. No. 62-9 at 2; *see also* Dkt. No. 68 ¶ 83 (Ball not disputing
paragraph referring to "the Hotel's investigation").  While both Ball and Marriott cite the
incident report in their Rule 56.1 statements, they do not expressly state that one was prepared.
The undisputed evidence shows that there was an incident report dated September 26, 2017
written by Israel, in which Israel writes that, on September 18, 2017, Ball approached Israel
while Israel was sitting in the cafeteria and "stated that, while serving a group of Guests – she

Dkt. No. 68 ¶ 71. In it, he wrote: "Guest approached bar to collect check. Guest proceeded to sign check in service area. The guest inquired about the location of the Pappy Van Winkle bottle. I gave the guest the location. The guest turned and collided with Cindy Ball the server." Dkt. No. 62-11; *see also* Dkt. No. 68 ¶ 71. Franzo thus did not corroborate Ball's statement that the customer grabbed her between her legs. Dkt. No. 68 ¶ 72. Ball testified at her deposition in this case that it was "impossible for [Franzo] to have seen" what happened because "[h]e was on the other side of the bar." Dkt. No. 72-1 at 129.

Davis also gave a written statement dated September 18, 2017. Dkt. No. 68 ¶ 73. She wrote:

> Tonight, Cindy said she was touched inappropriately by a guest who left Foundry. I did not witness the actual incident, I was just outside Foundry, but she came out to tell me after the guest left. (The guest was paying his check at the bar when the incident took place.) According to her he "grabbed her ass" in a non-accidental way. She said she felt his fingers "inside her" and was very shaken. At first it seemed like it might have been an accident because the guest did not know she was behind him (according to Dominick F. who saw the incident), but she became more upset as time went on. The guest did not say anything inappropriate nor did he apologize. She grew angry with Dominick who suggested it might have been an accident saying she felt "fingers in her ***hole"—and left Foundry crying. I followed her to the elevators and outside for fresh air. She said she feels uncomfortable at her job lately. First there was an incident where a guest touched her face a few months ago, last week someone poked her and now this. She seemed very shaky. On the 6th Fl., she ran into Allan [sic] from security who urged her to fill out a report.

Dkt. No. 62-12.

On September 19, 2017, Human Resources Director Maria Lavides called Ball to discuss the Hotel's investigation thus far, and Lavides told Ball that her "co-workers had been interviewed and no one saw it." *Id.* ¶ 83. That same day, Ball emailed her union Business

---

was touched by one of them." Dkt. No. 62-9.

Agent, Marie Richard, *id.* ¶ 84; under a subject line "last night a guest sexually assaulted me,"

Ball wrote:

> Last night I was at work picking up drinks from the bar and someone put his hand up my ass from behind. It was no accident nor no joke. If I had been wearing a skirt it would have felt much more intrusive. Not on the buttock, which is inappropriate anyway but really up in my areas. I turned to see a man walking away (he had been at the bar drinking but his check only had 2 drinks on it so I don't think alcohol was the issue here) Boss (a woman) kept saying maybe it was an accident but it clearly wasn't. I started to cry, I started to doubt myself but I walked off the floor to pull myself together. Went to the cafeteria and saw my friend, Allen Israel, who works in security to vent. He automatically encouraged me to write a report. He was very sympathetic and concerned but he said I didn't have to make a report but he thought I should. What if the guy comes back? He was right and then I found myself very angry b/c I think the first thing out of my manager's mouth, after closing it from the floor, should have been: Is he still here? I'm calling security! and also, let's make a report. Guy who assaulted me very slowly walked out of the bar by the rear exit.
>
> After this all passed I got so wound up I threw up and went home and called a friend. I told her also that I don't know why I didn't cry out or scream or hit him. It's partly b/c I'm at work and trained basically to put up with shit from guests and also a recurring dismissal of any sexual approaches in my business. Out on the street my guard is up but at work I'm supposed to feel safe. Then I don't know what else was involved with my lack of real response. I was just thrown.
>
> Last week a guest was poking me in the chest. One security guy came by and I said he needed to get out and security guy left and did nothing.
>
> . . .
>
> I don't feel safe a[t] work now. I called out tonight even though I have no sick days left. I am seeing my therapist at 2.

Dkt. No. 62-8.

That day, Ball also emailed the Hotel Manager, Sean Cassidy, asking for a meeting with him, Richard, and the General Manager, Sean Verney. Dkt. No. 68 ¶ 85. In the email, Ball wrote that she "was assaulted last night by a patron in the bar," and that it was "the third incident over the last week that has made [her] feel unsafe working at the Westin right now and the last of

several incidents where [she] was not encouraged to make a report and other than last night security is slow or unresponsive."  Dkt. No. 64-5.

Ball requested time off from work on September 19 and September 20, 2017, the two days following the incident.  Dkt. No. 68 ¶ 86.  Although she had no available paid time off, Marriott worked with Ball to ensure that she was given these two days off under the Family and Medical Leave Act ("FMLA") to recover from the incident.  *Id.*  When Ball returned to work on Monday, September 25, 2017, she met with Richard, Cassidy, and Lavides.  *Id.* ¶ 88.  At this meeting, Ball viewed the video of the incident for the first time.  *Id.*  After viewing the video, Richard asked to see the security report and Lavides asked Ball if the customer apologized.  *Id.* ¶¶ 88–89.  In response to Lavides' question, Ball "scoffed and physically pounded [her] head on the table and said the man is a predator[,] [t]hey don't apologize."  *Id.* ¶ 88 (internal quotation marks omitted).  Lavides provided Richard with a copy of the video, but Ball never asked her union for a copy of the video because she went to the police instead.  *Id.* ¶ 90.  Ball asserts that, before going to the police, she asked Lavides for a copy of the video, but she never got it, *id.*; she testified that she did not ask the union for a copy.  Dkt. No. 72-1 at 195.  Ball never followed up with Richard about the matter after the September 25th meeting, and no one from the union contacted Ball to pursue the matter further.  Dkt. No. 68 ¶ 91.

A few days after the incident, Ball went to the police station to make a report.  Dkt. No. 68 ¶ 92.  She met with Detective Rosita Williams and described the incident.  *Id.*  As part of the police investigation, Detective Williams reviewed the video of the incident, and Ball and Detective Williams reviewed the video together on or about October 31, 2017.  *Id.* ¶ 93.  This meeting was the last time Ball "bothered to pursue" the matter with Detective Williams, and Ball

did not call Detective Williams after that meeting to follow up with her; similarly, after this

meeting Detective Williams never called Ball to discuss the matter. *Id.* ¶ 95.

On October 3, 2017, a case concerning the incident was opened on Marriott's

"EthicsPoint Incident Management" system. Dkt. No. 62-14.[2]  The "details" section in that

report states, among other things, that Lavides "did review camera footage and cannot confirm

that the guest groped her." Dkt. No. 62-14 at 1.

On November 8, 2018, Plaintiff sent an email to two of her friends, in which discusses

the events of September 18, 2017, and she starts the email with: "it's all absurd.  There's video.

Or is there?  Did I see what I thought I saw?  Did I feel what I thought I felt?  Did it happen at

all?  But why was I so upset?  I get bumped into every. single. night." Dkt. Nos. 64-4, 68 ¶ 97.

She continues: "So what happened?  Now I'm no longer sure.  Am I being gaslighted?" Dkt.

Nos. 64-4; 68 ¶ 97.

In response to the incident on September 18, 2017, Marriott installed panic buttons. Dkt.

No. 72-1 at 196, 210; Dkt. No. 68 ¶ 99.  While Ball alleged that one of the panic buttons "is now

---

[2] In her Rule 56.1 Counterstatement, Plaintiff "disputes" the paragraph stating that "[o]n October 3, 2017, the Hotel opened a formal Ethics Point investigation, which confirmed the incident was not intentional.  Specifically, the investigator noted that Maria [Lavides] did review camera footage and cannot confirm that the guest groped [Plaintiff]." Dkt. No. 68 ¶ 96.  While she "disputes" the entire paragraph, Ball specifies only "that Defendant, in their own investigation not being able to 'confirm' that their guest groped Plaintiff is not the same as confirming that it was not intentional" and cites to the Ethics Point investigation itself.  *Id.*  "In responding to a Rule 56.1 statement, the party opposing the motion for summary judgment is 'required by [the district's] Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.'  . . . 'If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.'" *Baity v. Kralik,* 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (first quoting *Risco v. McHugh,* 868 F.Supp.2d 75, 86 n. 2 (S.D.N.Y.2012); and then quoting *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014)).  Ball does not point to any evidence to dispute that an Ethics Point investigation was opened, and the evidence to which she points confirms that it was.  The Court considers such facts to be admitted and thus undisputed.

operational" but does not lead to a faster response time by security, Dkt. No. 1 ¶ 19, she testified

that these panic buttons did not work, Dkt. No. 72-1 at 196–97, and that one later "went

missing," *id.* at 209.  She testified that one panic button was behind the bar, and another was in

the pantry.  *Id.* at 210.  Since September 18, 2017, Plaintiff has not been subjected to any

harassment on the job with Marriott, Dkt. No. 68 ¶ 100, and she is not aware of any other people

who have experienced harassment on the job at Marriott.

## IV.    Marriott's Policies

At all times relevant to this dispute, Marriott maintained a policy strictly prohibiting

unlawful discrimination and harassment in the workplace.  *Id.* ¶ 1.[3]  The policy provides that

Marriott "insists that all associates be treated with dignity, respect and courtesy" and "maintains

a 'zero tolerance' policy regarding discrimination, harassment or retaliation occurring in the

workplace or in connection with work."  *Id.*  As per the policy, Marriott prohibits both unlawful

action and "conduct and comments that are not severe enough to violate state, federal or local

law but are still inappropriate in our workplace."  *Id.* ¶ 2.  The policy explains and defines sexual

harassment and provides examples of the conduct that may constitute harassment.  *Id.*  It

expressly states it is Marriott's commitment to "[t]ake appropriate action in dealing with guests,

former Associates, vendors or visitors to [Marriott] facilities who engage in such behaviors.

Such action may include notifying the police or other law enforcement personnel and

prosecuting violators of this policy to maximum extent of law."  Dkt. No. 62-2 at 1.

---

[3] The policy cited refers to "Starwood," which Marriott acquired in September 2016, but the
parties referred to the relevant entity as Marriott in their Rule 56.1 Statements, and the Court will
do so here as well.  *Id.* ¶ 1 n.1; *see also* Dkt. No. 74-1.

Marriott strongly encourages associates to immediately report suspected violations of its policy, and it provides multiple prevention and reporting avenues.  Dkt. No. 68 ¶ 3.  The policy provides that:

> All associates are strongly encouraged (and supervisory associates are required) to report immediately any discrimination, harassment or retaliation to a member of their local Human Resources Department or the General Manager of a property, an area or regional Human Resources representative, or a member of corporate Huma Resources.  Alternatively, associates may use the Marriott Associate Hotline, 800-254-4375, to make a report at www.HOTethics.com or contact the Office of the General Counsel.  You should not assume Marriott is aware of your concern.  For Marriott to prevent and correct harassing discriminatory conduct, it is essential that Marriott receive information about every instance of such conduct in a timely manner.  Under no circumstances should you believe that you cannot or should not report any discrimination, harassment or retaliation.  Do not allow an inappropriate or unlawful situation to continue by not reporting it, regardless of who is creating that situation.

*Id.*  The policy provides that Marriott "will not tolerate unlawful retaliation directed against associates who make complaints of discrimination, harassment or retaliation, report discrimination, harassment or retaliation they observe, or provide information relating to such complaints or reports."  *Id.* ¶ 4.  Marriott is committed to investigating complaints of violations of the policy as appropriate.  *Id.*; *see also* Dkt. No. 74-1 at 35.  The policy states that "Marriott will not tolerate the following action by anyone at any level: Violence, threats of violence, intimidation or any conduct that creates an intimidating or otherwise offensive work environment."  Dkt. No. 68 ¶ 5.[4]

Marriott includes copies of its anti-discrimination/anti-harassment policy in its handbook that is distributed to every associate.  *Id.* ¶ 1.  When Ball started working at the Hotel, she was

---

[4] Davis testified, however, that, at the time of the incident, to her understanding there was not "a policy and procedure in place . . . if a service worker made a complaint that a guest behaved inappropriately toward them in a sexual manner."  Dkt. No. 72-2 at 22–23.  But that testimony appears to be inconsistent with the general policy that encouraged employees to report incidents of discrimination or harassment.  She also testified that, at the time, neither the Foundry nor the Marriott had "a policy and procedure of when guests should be removed from the bar."  *Id.* at 29.

provided a copy of the handbook, *id.* ¶ 8, and she signed an acknowledgment of the handbook on February 4, 2003, *id.* ¶ 9.  Ball received Marriott's "zero tolerance" policy when she started working at the Hotel, *id.* ¶ 11, and she understood that Marriott maintains a "zero tolerance" policy regarding discrimination, harassment and retaliation occurring in the workplace or in connection with work, *id.* ¶ 10.  Ball also received Marriott's "Workplace Violence Prevention" policy.  *Id.* ¶ 12.  She attended training sessions on these anti-harassment and violence-prevention policies.  *Id.* ¶ 13.

## V.      Ball's Application for a Bartender Position

Marriott posted an opening for a bartender position at the Foundry on May 9, 2018.  *Id.* ¶¶ 103–04.  On May 26, 2018, Chris Miller was hired as Director of Restaurant and Bars to replace Cohen, who had been moved to a different role at the Hotel.  *Id.* ¶ 105.  Before his hiring, Miller had worked at a different hotel as "Director of the View Complex" at the New York Marriott Marquis.  *Id.*  Miller was tasked with overseeing the hiring process for the new bartender position.  *Id.*  Daniel Brower, the Director of Human Resources Operations; Kristen Love, the Assistant Director of Restaurants and Bars; and Cassidy were also involved in the hiring process.  *Id.* ¶ 106.

The majority of the applicants for the bartender position interviewed in early May 2018.  *Id.* ¶ 107.  Ball applied for the position "very late" in the process—she applied the day before applications were scheduled to close.  *Id.* ¶ 108.  Ball knew that the position was open, but she had been hesitant to apply because she liked the seniority she has as a server.  *Id.* ¶ 109.  Ball advised Davis that she was interested in the position, and Davis brought Ball to Human Resources immediately to apply.  *Id.* ¶ 110.  On June 4, 2018, Ball interviewed for the bartender position with at least Brauer, *id.* ¶ 111, and a couple of days later, she interviewed with Cassidy, *id.* ¶ 112.

Miller, Love, and Cassidy met in early June 2018 to discuss the hiring process and agreed that, because several candidates had interviewed well and were qualified for the job, Miller would create a written test and whoever scored highest on the written test would be offered the bartender position. *Id.* ¶ 113.[5] On or around June 25, 2018, Miller created the written "Westin Time Square Bartender Practical Test." *Id.* ¶ 114. Ball took this test on June 27, 2018 and scored a 26/30. *Id.* ¶ 115. Ball asserts that she lost points "for stating that 1.5 ounces is the correct amount of whiskey in a whiskey sour" in response to a question not asking for the correct amount of whiskey but the recipe for a whiskey sour, and states that if the test "been correctly scored, she would have received at least a 27 out of 30." *Id.* ¶ 115.[6] The question at issue asked "What is the recipe for a Whiskey sour?" and provided four multiple-choice answers, the first two being: "A. 1 ounce whiskey and 2 ounces of sour mix" and "B. 2 ounces of whiskey and sour mix." Dkt. No. 63-1 at 5. An individual named Alfredo Tapia took the test on June 26, 2018 and scored a 27/30, which was the highest score among the job applicants. Dkt. No. 68 ¶ 116.

---

[5] Ball states that she "disputes" this paragraph, but she does not point to any evidence that would contradict any of the facts set forth therein. Instead, she cites her own testimony that she was told by Miller "that he knew she would be better with the guests tha[n] Alfredo Tapia" and asserts that the test was flawed and that she lost points for a correct answer. *Id.* She similarly "disputes" paragraph 115, which states the score Ball got on the test, asserting again that the test was flawed. *Id.* ¶ 115. Responses to statements contained in a Rule 56.1 Statement "that 'do not point to any evidence in the record that may create a genuine issue of material fact[ ] do not function as denials, and will be deemed admissions of the stated fact.'" *Baity*, 51 F. Supp. 3d at 418 (quoting *Risco*, 868 F.Supp.2d at 86 n. 2). The facts regarding the purpose of the written test and Ball's score on it are thus deemed admitted.

[6] In support of her contention that she "lost points on this test for stating that 1.5 ounces is the correct amount of whiskey in a whiskey sour, which is correct," *id.* ¶¶ 113, 115, Ball cites to three links: (1) https://www.crownroyal.com/whisky-cocktails/whisky-sour; (2) https://www.bulleit.com/whiskey-drinks/whiskey-sour/; and (3) https://threemanycooks.com/conversations/real-whiskey-sour-official-drink-summer/. *Id.* While all of these links contain recipes where the amount of whiskey is 1.5 ounces, none provide the recipe for a whiskey sour as simply "1 ½ oz [whiskey] & sour." *See* Dkt. No. 63-2.

On June 15, 2018, Cassidy's employment at the Hotel ended. *Id.* ¶ 117. His departure was part of a broader change in the upper management team at the Hotel, which included the hiring of a new General Manager, named Michael Wlodkowski, and a new Hotel Manager, named David Behar. *Id.* ¶ 118. This change was acknowledged in a post Ball made to her Facebook account on July 1, 2018, which read:

> So there's been a huge regime change at work: Hotel director, hotel manager and HR director. All of them now want to be involved in choosing the goddamn bartender b/c it's, oh, you know, so fucking important. You'd think they were choosing a new CEO. It could be another 2 weeks before I hear. Of course I still might not get the job so there might be a time when I am still waiting and hoping.

*Id.* ¶ 119.

On July 26, 2018, Alfredo Tapia was hired for the bartender position. *Id.* ¶ 120. Ball testified that, when Tapia started, he didn't know how to make a brandy Alexander and incorrectly put sweet vermouth into a muddled old fashioned. Dkt. No. 72-1 at 222.

## PROCEDURAL HISTORY

On or about April 30, 2018, Ball filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"). Dkt. No. 68 ¶ 121. By letter dated August 8, 2018, the NYSDHR sent the verified complaint to Marriott. *Id.* ¶ 122. On May 30, 2019, the NYSDHR issued a right-to-sue letter to Ball, finding no probable cause to proceed. *Id.* ¶ 123.

On November 15, 2019, Ball filed her complaint (the "Complaint") in the instant action. *See id.* ¶ 124; Dkt. No. 1. In the Complaint, Ball alleged that she was subject to sexual harassment while working for Marriott on three separate occasions: First, while working on October 18, 2016, Dkt. No.1 ¶ 11; second, while working on September 10, 2017, *id.* ¶ 13; and third, while working on September 18, 2017, *id.* ¶ 17. She alleged that, following these incidents, Marriott took no action to protect Ball from future sexual harassment. *Id.* ¶¶ 12, 15–16. She also alleged that, since she filed the NYSDHR complaint, Defendant retaliated against

Ball by not hiring her as a bartender and "instead hir[ing] a male employee who has less experience than Ball and did not know how to make basic drinks." *Id.* ¶ 21.  Ball asserts that she was subject to a hostile work environment and adverse employment actions in retaliation to her opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.  Id.* ¶ 24.

Marriott filed its motion for summary judgment on October 29, 2021.  Dkt. No. 59.  Ball filed an opposition on December 20, 2021, *see* Dkt. No. 70, and Marriott filed a reply on January 18, 2022, *see* Dkt. No. 73.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted).  "[I]n assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d

140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137.

Local Civil Rule 56.1 of the Southern District of New York sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

Marriott moves for summary judgment on Ball's hostile work environment claim and retaliation claim.  The Court will address each in turn.

## I.      Hostile Work Environment

### A.      Events Considered

Ball points to three events in connection with her claim that she was subjected to a hostile work environment: the October 18, 2016 incident, the September 10, 2017 incident, and the September 18, 2017 incident.  Marriott argues that Ball's allegations regarding the October 2016 incident are time barred and cannot be used to support her hostile work environment claim

because she did not include them in an administrative claim by August 14, 2017—300 days after October 18, 2016.  Dkt. No. 59 at 18–19.  Ball responds that events that took place prior to April 30, 2017—"300 days prior to the filing of Plaintiff's complaint with the New York State Division of Human Rights," Dkt. No. 70 at 10—may be considered under the "continuing violation" doctrine applicable to hostile work environment claims.  *Id.* at 10–11.  In reply, Marriott argues that the evidence in the record does not support considering the events as part of a "continuing violation" under Title VII such that the events may be considered in connection with Ball's hostile work environment claim.

"Title VII requires an aggrieved party to file a charge of discrimination with either the Equal Employment Opportunity Commission or [NYSDHR] within 300 days of the alleged act of discrimination; the failure to do so will result in the claims being time-barred."  *Johnson v. Buffalo Police Dep't*, 46 F. App'x 11, 13 (2d Cir. 2002) (summary order).  While claims sounding in "discrete discriminatory or retaliatory actions such as 'termination, failure to promote, denial of transfer, or refusal to hire,' . . . are not actionable if they occurred prior to the 300-day period even though they may be 'related to' acts that occurred within the permissible 300-day period," "'hostile environment claims . . . are different in kind from discrete acts,' as '[t]heir very nature involves repeated conduct.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–15 (2002)).  "Thus, '[a] charge alleging a hostile work environment claim . . . will not be time barred so long as acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*.'"  *Id.* (quoting *Morgan*, 536 U.S. at 122); *see also id.* (concluding that "[t]he district court erred in ruling that it could not consider pre-February 16, 2013 [(300 days prior to her commencement of administrative proceedings)] events in

connection with assessment of liability on the hostile work environment claim").

"[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 105). "Accordingly, if 'any act falls within the statutory time period,' [a court] need[s] 'to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice.'" *Id.* at 76.

There is no dispute that at least two of the events on which Ball rests her hostile work environment claim—those occurring in September 2017—fall within the statutory time period. *See* Dkt. No. 59 (Marriott arguing that only allegations related to the October 18, 2016 incident are time barred); Dkt. No. 70 (Ball stating that "as Defendant acknowledges, all acts that occurred on or after April 30, 2017 are timely, as this is 300 days prior to the filing of Plaintiff's complaint with the [NYSDHR]"); Dkt. No. 73 (Marriott stating that "the Court should decline to consider [allegations before April 30, 2017] in support of her argument that the events in September, 2017 established a hostile work environment under Title VII"). Marriott argues that the allegations regarding the October 2016 incident cannot be used to support Ball's hostile work environment claim, while Ball argues that she can point to events that occurred "between 2010 through September 18, 2017, which are prior to April 30, 2017" as "part of an ongoing hostile work environment." Dkt. No. 70 at 10–11.

"Under *Morgan*, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." *McGullam*, 609 F.3d at 77. "Mindful of the 'fact-specific' and 'amorphous' nature of

hostile work environment claims, the Second Circuit Court of Appeals has instructed courts to make an 'individualized assessment of whether incidents and episodes are related.'" *Dikambi v. City Univ. of New York*, 2021 WL 4198252, at *3 (S.D.N.Y. Sept. 14, 2021) (quoting *McGullam*, 609 F.3d at 77). A court may consider whether the incidents occurred in different environments, such as different departments, *see McGullam*, 609 F.3d at 78; whether there was an "intervening action by the employer," *see id.*; *Morgan*, 536 U.S. at 118; whether the harasser was the same, *see Dikambi*, 2021 WL 4198252, at *4; *Sanderson v. N.Y.S. Elec. & Gas Corp.*, 560 F. App'x 88, 92 (2d Cir. 2014) (summary order); and the frequency of the conduct, *see Morgan*, 536 U.S. at 120–21 (affirming relatedness of conduct where pre- and post-limitations period conduct "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers" (alteration adopted) (internal quotation marks and citation omitted)). "The lapse in time between the two events is not itself dispositive," though it may be relevant. *Dikambi*, 2021 WL 4198252, at *4; *see also McGullam*, 609 F.3d at 78 ("Although [an] incident-free interval does not preclude relatedness, it renders less plausible the notion that" comments that may appear otherwise unrelated are "of a piece" with other offensive conduct); *Villar v. City of New York*, 135 F. Supp. 3d 105, 132 (S.D.N.Y. 2015) ("[A] twenty-one-month gap, in normal circumstances, would make it less plausible that the conduct is sufficiently related to constitute a continuing violation . . . ."). And "the more similar the incidents are in severity, the more likely it is that the incidents are related under *Morgan*." *McGullam*, 609 F.3d at 78 n.5.

### 1.     The 2010 Incident

In arguing that pre-April 30, 2017 events may be considered in connection with her hostile work environment claim, Ball argues: "Plaintiff alleges specific and related discriminatory events which occurred, between 2010 through September 18, 2017, which are prior to April 30, 2017. These events were part of an ongoing hostile work environment, as

evidenced by the fact that they involve Ball being sexual [sic] harassed and Defendant doing

little to nothing to prevent such harassment."  Dkt. No. 70 at 10–11.  The reference to 2010

appears to be to an incident referenced in the "Statement of Facts" section of her brief in

opposition to the motion for summary judgment, which describes an incident that occurred

"[s]ometime around 2010," in which a man "deliberately knocked his wine glass off the table,"

and when Ball bent down to pick up the glass, "one of the men opened his legs, pointed to his

crotch and smiled at Ball."  Dkt. No. 70 at 1–2.  She states that she reported the incident to the

manager at the time and a security agent, but neither of these individuals took action in response

to the complaint, and because she felt "discouraged and unsupported by her manager," she did

not report the incident to any other management.  *Id.* at 2.

    Ball, however, did not make any references or allegations with respect to this 2010

incident in the Complaint filed in this action, *see* Dkt. No. 1, or in her verified complaint

submitted to the NYSDHR, *see* Dkt. No. 62-17; nor did she make any statements about it in her

Rule 56.1 Counterstatement.  "[T]he central purpose of a complaint is to provide the defendant

with notice of the claims asserted against it," *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361

(2d Cir. 2006) (Sotomayor, J.), and "[a] party may not use his or her opposition to a dispositive

motion as a means to amend the complaint," *Smith v. City of New York*, 385 F. Supp. 3d 323, 338

(S.D.N.Y. 2019) (quoting *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007)

(summary order)).  To the extent that Ball attempts to base her hostile work environment claim—

even in part—on the 2010 event, she has failed to put Marriott on notice of it by failing to plead

any facts about the 2010 incident and raising arguments about it for the first time in her

opposition brief.  Given that Marriott is moving for summary judgment on the claims actually

alleged in the Complaint, the Court is disinclined to consider the 2010 event in assessing the

hostile work environment claim.  But in any event, the Court need not consider it because, based on the facts in the record and drawing all inferences in favor of Ball, it is not sufficiently related to the timely events to constitute "a continuation of the conduct that created a hostile work environment."  *Dikambi*, 2021 WL 4198252, at *4.

The specifics in the record regarding the 2010 incident are sparse.  According to Ball's deposition testimony, a guest dropped a glass on the floor, and when she went to pick it up, the guest pointed to his crotch area.  Dkt. No. 72-1 at 20, 68.  She did not remember when it took place, but when asked if it was between 2003 and 2010, she said it was "[p]robably more around 2010."  *Id.* at 69.  She reported it to her manager, Mauro Villacreses, who responded "you work in a bar.  What do you expect" and did nothing.  *Id.* 70.  When she went out to smoke a cigarette, she told a female security agent whose name she does not remember about the incident, and the security agent said "oh, hell, no. . . . let me know if anything else happens."  *Id.* at 71.  Ball did not report the incident to human resources or to a general manager, stating that she "felt discouraged that Mauro did not support [her]."  *Id.* at 73.

Even drawing all inferences in favor of Ball, the event that she testified occurred "around 2010," *id.* at 69, is not sufficiently related to the timely events of 2017 to be part of the same hostile work environment.  Ball argues that the 2010 incident was "part of an ongoing hostile work environment" because it "involve[s] Ball being sexual [sic] harassed and Defendant doing little to nothing to prevent such harassment."  Dkt. No. 70 at 10–11.  And to be sure, there are some general similarities in the 2010 incident and the later conduct in that, drawing all reasonable inferences in favor of her, Ball was made to feel uncomfortable by conduct of a sexual nature by a patron in the restaurant and that she did not feel supported by her manager, but that is where the similarities end.

Nonetheless, viewing the facts in the light most favorable to Ball, none of the individuals involved in the 2010 incident—neither the patrons nor, more importantly, the Hotel staff—"were among the perpetrators of" the complained-of conduct occurring in 2017.  *See Sanderson*, 560 F. App'x at 92.  The individuals involved in the Hotel's response (or lack thereof) were an unnamed security agent and Villacreses, who is not mentioned in connection with the later events, and there is no basis to conclude Villacreses was even employed by the Hotel in 2017. *Cf.* Dkt. No. 72-1 at 68 (Ball testifying that she "do[esn't] remember when [Villacreses] worked there").  There is no basis to conclude that supervisors that were involved in the later incidents were made aware of the incident or Villacreses's response (or were even employed by the Hotel at that time), particularly given that Ball did not report the incident or Villacreses's response to human resources or a general manager.  That she did not report the incident to human resources or another supervisor also makes Marriott's complained-of conduct different in kind between the 2010 incident and the later events, where Ball complains that despite raising the matter with supervisors, Marriott did not take appropriate action.  While the time period between the complained-of events—six or seven years between this event and the next one where Ball states that she was sexually harassed by a patron—may not alone be dispositive, "it renders less plausible the notion that" these incidents were part of the same hostile work environment, particularly given the differences in relevant personnel.  *McGullam*, 609 F.3d at 78.  Nor are the incidents similar in severity.  While the restaurant patron's conduct in 2010, as recounted by Ball, was undoubtedly inappropriate, it is far less severe than the incidents that she complains of years later, where she alleges that restaurant customers made physical contact with her and where she complained to supervisors but, she alleges, to no avail.  *See id.* at n.5 ("[T]he more similar the incidents are in severity, the more likely it is that the incidents are related under

*Morgan*.").  Because the 2010 incident was not sufficiently related to the incidents that fell within the statute of limitations, it is not actionable as part of Ball's hostile work environment claim.[7]

### 2.   The October 18, 2016 Incident

The Court reaches a different conclusion, however, with respect to the 2016 incident. Like the timely 2017 incidents, the 2016 incident was of a similar severity in that it involved a restaurant patron making inappropriate physical contact with Ball.  Ball elevated her concerns to directors and human resources personnel in connection with the 2016 and the 2017 incidents, unlike with respect to the 2010 incident.  The people who were made aware of the incidents were similar in some circumstances: Ball reported both the 2016 incident and one of the timely 2017 incidents to Zoe Cohen, the Director of Restaurants and Bars.  Ball alleges that, despite complaining to higher-ups—including at least one of the same individuals—of these instances of harassment, where she was physically touched by a restaurant guest, Marriott failed to take appropriate action, creating a hostile work environment for her.  The similarity in the type and severity of conduct by the patrons and the Defendant employees, the overlap in personnel, and the relatively short time period between the events renders the events sufficiently related for the purposes of the hostile work environment claim.  The Court will therefore consider the otherwise time-barred 2016 incident in connection with the claim.

---

[7] While courts have concluded that time-barred incidents may still "constitute valid background evidence for hostile work environment claims," *see Annunziata v. Int'l Bhd. of Elec. Workers Loc. Union #363*, 2018 WL 2416568, at *14 (S.D.N.Y. May 29, 2018) (citing *McGullam*, 609 F.3d at 79 n.7, 86–87), considering the 2010 incident as such background would not materially alter the Court's analysis as to the viability of Ball's hostile work environment claim.

### B.      The Merits

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult [based on *inter alia*, sex] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Sciano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Whether a hostile work environment exists "is ultimately a factual, not a legal, determination," *id.* at 605, and to find that one exists "[a] jury must be able to conclude that the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse," *id.* at 604.  "To establish a prima facie case of hostile work environment, the plaintiff must show [not only] that the discriminatory harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' [but also] 'that a specific basis exists for imputing' the objectionable conduct to the employer." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).  "An employer who has notice of a hostile work environment has a duty to take reasonable steps to eliminate it." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998).

Where the alleged harassers in a hostile work environment claim are non-employees, an "'employer will be held liable only for its own negligence,' and the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).  Under that standard "the conduct of certain non-employees may be imputed to the employer where (1) the employer exercises a high degree of control over the behavior of the non-employee, and (2) the employer's own

27

negligence permits or facilitates that non-employee's discrimination." *Leroy v. Delta Air Lines, Inc.*, 36 F.4th 469, 475 (2d Cir. 2022) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38–39 (2d Cir. 2019)).  Relevant to the question whether an "employer was negligent in failing to prevent harassment from taking place" is "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Vance v. Ball State Univ.*, 570 U.S. 421, 449 (2013); *see also Leroy*, 36 F.4th at 476 (finding complaint did not plead the requisite negligence where there were no allegations of any of the circumstances set forth in *Vance*).

"In determining the appropriateness of an employer's response" to third-party acts of harassment, a court "look[s] to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility the employer has with respect to [the offender's] behavior.'" *Summa*, 708 F.3d at 124 (alteration adopted) (quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)).  "The standard for reviewing the appropriateness of an employer's response to co-worker"—and, by extension, third-party—"harassment 'is essentially a negligence one, and reasonableness depends among other things on the gravity of the harassment alleged.'" *Id.* at 125 (quoting *Torres v. Pisano*, 116 F.3d 625, 638 (2d Cir. 1997)); *see also id.* at 124 (adopting EEOC rules "in imputing employer liability for harassment by non-employees according to the same standards for non-supervisory co-workers, with the qualification that [the Circuit] 'will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees'" (quoting 29 C.F.R. § 1604.11(e))).  The court also looks to whether the defendant "permitted or facilitated" the discriminatory behavior. *Leroy*, 36 F.4th at 476.

Marriott argues both that Ball was not the victim of severe or pervasive workplace hostility—focusing on the September 2017 incidents and asserting that "an objective person would consider the patron's touching [of Ball's buttocks] to be accidental" and that Ball's "own conduct belies her claim that the conduct was severe," Dkt. No. 59 at 23–24—and that there is no basis to impute liability to Marriott. *Id.* at 20–28. Ball disagrees, contending that "the totality of the circumstances, viewed in a light most favorable to Plaintiff are that Ball was subjected to a hostile work environment." Dkt. No. 70 at 12. She also argues that "Defendant[] did not act reasonably with respect to Ball's complaints" because it "failed to take any action in response to these complains or to prevent the further sexual harassment of Ball by customers," and "[a]s a direct result of [this failure] . . . a customer sexually assaulted Ball on September 18, 2017." *Id.* at 15.

In *Summa v. Hofstra University*, the Second Circuit affirmed a grant of summary judgment in favor of the defendant university. 708 F.3d at 125. In that case, a student-employee, who was employed as the University's football team manager, complained that repeated statements made by members of the football team—non-employees of the school—had created a hostile work environment. *Id.* at 120–25. Without passing on the question whether the student-employee's "showing of harassment was sufficiently severe or pervasive to constitute a hostile work environment under Title VII," the Circuit held that the conduct of the football players could not be imputed to the University, and it was thus entitled to summary judgment. *Id.* at 124. In so holding, the Circuit found that, each time the University was alerted to the harassing conduct, its employees promptly acted to address and end the harassment, and explained that "[b]ecause defendants took the needed remedial action in this case, the harassment

carried out by some players on the football team cannot be imputed to the University and its personnel." *Id.* at 125.

Here, no reasonable jury could conclude that the offending customers' conduct may be imputed to Marriott. The undisputed evidence shows that Marriott's response to the offending customers was "timely and appropriate in light of the circumstances," *Summa*, 708 F.3d at 124, and that its "own negligence" did not "permit[] or facilitate[]" their discriminatory conduct, *Leroy*, 36 F.4th at 475–76. There is no evidence that any of the three incidents at issue involved a repeat customer. *Cf. Swiderski v. Urban Outfitters, Inc.*, 2017 WL 6502221, at *9 (S.D.N.Y. June 4, 2015). The case does not involve a circumstance where an employer, aware of a customer's prior discriminatory behavior, nonetheless permits him to return. The three incidents—one of them separate from the others by eleven months and the other two occurring in close proximity—involved different customers. In response to each of the three events that may be considered for the hostile work environment claim—the October 18, 2016 incident, the September 10, 2017 incident, or the September 18, 2017 incident—Marriott took immediate action and provided an avenue by which Ball could lodge complaints about the conduct of customers. After a customer grabbed her face on October 18, 2016, Fish, Ball's supervisor, stood between Ball and the customer, blocking the customer from coming into contact with Ball, Dkt. No. 68 ¶ 20; reported the customer's conduct to a security manager, who then came to the bar, where the incident occurred, *id.* ¶ 23; and emailed his supervisor to report on the relevant events, *id.* ¶ 24. Before the security manager arrived at the bar and would have been able to remove the customer, the customer had already left. *Id.* ¶ 23. The following day, Ball met with the Human Resources Director to discuss the incident, *id.* ¶ 28; in addition, the customer was checking out the following day, and, as a result of her complaint, Ball was informed that she

would not have to serve the customer—who was a guest at the Hotel—again, *id.* ¶ 30.  Marriott's response to the October 2016 incident was thus immediate and forward-looking in that staff ensured the customer would not again make contact with Ball and that Ball would not have to interact with him for the very short remainder of his stay, and the undisputed evidence shows that Marriott provided a system for registering complaints and then responded to the complaints. *See Leroy*, 36 F.4th at 476.  Ball has provided no support for the proposition that Marriott was required to do more.  *See also Flower v. Mayfair Joint Venture*, 2000 WL 272187, at *9 (S.D.N.Y. Mar. 13, 2000) (granting summary judgment to defendant where hotel did not ban guest after alleged assault in part because "[p]laintiff cite[d] no authority for her proposition that Title VII requires her employer to ban a customer from its premises").

Marriott's responses to the September 2017 events were similarly timely and appropriate and devoid of any evidence of negligence.  On September 10, 2017, when Ball heard male customers cough into their hands the word "pussy" when she walked by the table and was poked in the chest by one of the patrons, she asked the bartender to call security, and security came. Dkt. No. 68 ¶ 31–34.  In response to Ball's concerns, the security officer told Ball, "I got your back."  *Id.* ¶ 34.  Although the security officer did not stay, the customers soon thereafter paid their checks and left without further incident.  *Id.* ¶ 35.  Again, Marriott timely provided a response in sending a security guard to check on Ball after the incident.  Marriott also provided a means to complain about the third-party conduct and offered a response to the complaint: the next day, Ball sent an email to Cohen and Davis and then met with them that same day.  *Id.* ¶ 36– 37.  At this meeting, Cohen offered to discuss the matter with Ball's interim manager, but Ball declined and told her she did not want that.  *Id.* ¶ 38.  On this record, where Plaintiff herself did not press the complaint and the customers left and there is no evidence that they returned, no

reasonable juror could find that Marriott acted unreasonably in response to the conduct or that it was Marriott's negligence that permitted or facilitated the discriminatory conduct.

Nor could a reasonable juror find that Marriott's negligence facilitated or permitted the harassment Ball faced on September 18, 2017 or that Marriott acted unreasonably in response to it.  In response to the September 18, 2017 incident, a member of Marriott's security staff encouraged Ball to write an incident report, *id.* ¶ 64, immediately alerted the Security Manager of the incident, *id.* ¶ 66, and had Ball write her statement down on an "Associate Statement" form, *id.* ¶ 68.  The Security Manager reported to where Ball was and asked Ball if she wanted to go to the hospital, but Ball declined.  *Id.* ¶ 67.  Ball was permitted to leave work early, *id.* ¶ 69, and Marriott worked with Ball to help Ball access FMLA leave in the days following the incident, *id.* ¶ 86.  In the immediate aftermath of the incident, Ball did not ask to have the customer removed and the customer—who was picking up his check at the time—in fact departed.  Following the incident, Marriott collected statements from various staff members and reviewed video to investigate the incident in more detail; provided this video and a security report to Ball's union representative; and convened a meeting with Ball, the Hotel Manager, the Human Resources Director, and Ball's union representative.  *Id.* ¶¶ 70, 86, 88–89.  Marriott also opened an investigation in their "Ethics Point" system.  *Id.* ¶ 96.  Ball may not agree with all of the conclusions reached during that investigation and, in particular, may not agree with the bartender that the incident involved an accidental touching, but Marriott was not required to agree with Ball and was permitted to reach its own conclusions based on its review of the evidence and its viewing of the video.  In any event, in response to the incident, Marriott installed "panic buttons" to allow associates to quickly call security.  *Id.* ¶ 99.  Ball quibbles that the buttons do not work, but she admitted in her Complaint that at least one button was

operational at the time she filed the Complaint, Dkt. No. 1 ¶ 19, and in any event, she does not

dispute Marriott's bona fides in attempting to address the situation.  In the years since this

incident, Ball has not been subject to any harassment on the job with Marriott nor is she aware of

anyone else who has experienced harassment on the job.  Dkt. No. 68 ¶¶ 100–101.

These actions belie Ball's assertion that Marriott "failed to take any response to these

complaints" and thus acted unreasonably.  Dkt. No. 70 at 15.  To the contrary, in each of the

incidents at issue, Marriott promptly responded to the situation and then met with Ball to address

her complaints and offered solutions to avoid similar situations going forward.  A response may

be reasonable even if an employer could have taken more drastic action.  *See Leroy*, 36 F.4th at

476 (explaining that the complaint did not indicate that a response taken to discriminatory

conduct by a passenger was insufficient even though the plaintiff offered an alternative remedy

of ejecting the passenger from defendant's property).  Ball complains that Marriott is unable to

completely "prevent the further sexual harassment of Ball by customers." Dkt. No. 70 at 15.  But

that is not the test.  The operator of a bar is not strictly liable under Title VII for every crude, or

even sexist, remark made by a customer.  The customer's conduct is imputable to Marriott only

if it is able to exercise a high degree of control and, even then, only if it is negligent in failing to

prevent the discriminatory conduct.  There is no evidence that Marriott "encourage[d],

condone[d], or approve[d] of the customer's conduct," *Swiderski*, 2017 WL 6502221, at *9, that

its negligence was what permitted the customers' rogue discriminatory conduct, or that it failed

to timely and appropriately address Ball's complaints.  Under the undisputed facts, Marriott

cannot be held liable for Ball's hostile work environment claim, and the Court will grant it

summary judgment on this claim.

## II.     Retaliation

Marriott also argues that it is entitled to summary judgment on Ball's retaliation claim.  It contends that Ball cannot establish that there was a causal connection between protected activity and any alleged adverse employment action.  Marriott argues: (1) the amount of time between Ball's "complaint about a hostile work environment [in September 2017] and her failure to receive a bartender position approximately ten months later is too attenuated [sic] to establish retaliation," Dkt. No. 59 at 30; (2) the decision-makers who responded to Ball's complaint were different from the decision-makers who made the final decision on who would be hired as the bartender, *id.* at 30–32; and (3) to the extent Ball ties her failure to get the bartender position to the filing of her NYSDHR complaint, there can be no causal connection because Marriott was not made aware of that complaint until August 8, 2018, which is after the bartender position was filled, *id.* at 32.  Marriott also argues that, even if Ball could establish a *prima facie* case of retaliation, it has proffered a non-retaliatory reason for Ball's failure to get the bartender position—Ball did not receive the highest score on the written test—and Ball cannot establish that the proffered reason was a pretext for retaliation.

Ball disagrees.  She argues that the temporal proximity between her complaint of a hostile work environment, which she states occurred in October, and her being "passed over" for the bartender position, which she inexplicably states occurred in May, establishes the causal connection necessary.  Dkt. No. 70 at 18.  She also argues that the explanation that the decision-makers chose to rely upon a multiple-choice test to make the hiring decision is "implausible" and that the test relied upon "was completely flawed," demonstrating that the proffered legitimate business reason "is nothing more than pretext for its retaliation of [sic] Ball."  *Id.*

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee

suffered a materially adverse action; and (4) there was a causal connection between the protected

activity and that adverse action.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs,*

*P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d

Cir. 2012)).  "Title VII retaliation claims must be proved according to traditional principles of

but-for causation . . . requir[ing] proof that the unlawful retaliation would not have occurred in

the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tx. Sw. Med.*

*Cntr. v. Nassar*, 570 U.S. 338, 360 (2013).  The burden of proof at the *prima facie* stage is "de

minimis, and the court's role in evaluating a summary judgment request is to determine only

whether proffered admissible evidence would be sufficient to permit a rational finder of fact to

infer a retaliatory motive."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation

marks and citation omitted).  "Where a plaintiff has made allegations of discriminatory

retaliation, courts must use 'an extra measure of caution' in determining whether to grant

summary judgment 'because direct evidence of discriminatory intent is rare and such intent often

must be inferred from circumstantial evidence.'"  *Avillan v. Donahoe*, 2015 WL 728169, at *6

(S.D.N.Y. Feb. 19, 2015) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d

Cir. 2006)).

Where a *prima facie* showing of retaliation has been made, the burden shifts to the

defendant to "articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the defendant proffers such a reason, "the

presumption raised by the *prima facie* case is rebutted and drops from the case."  *Kovaco v.*

*Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (internal quotation marks

omitted).  The plaintiff then bears the ultimate burden to show that the employer's proffered

reason was merely a "pretext for an unlawful motive."  *Craine v. Trinity Coll.*, 791 A.2d 518,

535 (Conn. 2002); *see Gorzynski*, 596 F.3d 93, 107 (2d Cir. 2010). "A plaintiff may carry this burden by reference to the same evidence used to establish a *prima facie* case, provided that the evidence admits plausible inferences of pretext." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88–89 (2d Cir. 2019).

"For purposes of a retaliation claim, causation can be established in one of three ways: with evidence that the retaliatory action happened close in time to the protected activity; that other similarly situated employers were treated differently; or with direct proof of discriminatory animus." *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009). A plaintiff must ultimately "establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. "However, the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Ball contends that the temporal proximity between her protected activity and Marriott's alleged retaliation of not hiring her for the bartender position is sufficient to show a causal connection for her *prima facie* case. The parties appear to agree at least for purposes of summary judgment that a complaint by Ball following the September 18, 2017 incident constituted protected activity. *See* Dkt. No. 59 at 30 (arguing that there is no causal link between Ball's failure to get the bartender job and her "September 18, 2017" complaint); Dkt. No. 70 at 18 (basing argument regarding causal connection on Ball's "complain[t] about the hostile work environment in October"). Ball asserts that this activity took place "in October," Dkt. No. 59 at 18, which appears to refer to a letter sent by Ball's counsel to Marriott dated October 17, 2017 complaining of Marriott's failure "to remedy the situation or to prevent future occurrences" after Ball was "sexually harassed by a guest," Dkt. No. 69-4; *see*

*also* Dkt. No. 59 at 6.  Marriott, on the other hand, dates the protected activity as September 18, 2017, which is the date that Ball complained about the customer grabbing her buttocks.  *See* Dkt. No. 59 at 30.  The allegedly retaliatory act—the hiring of Tapia and not Ball—took place on July 26, 2018.  *See* Dkt. No. 68 ¶ 120.[8]  Whether the Court calculates the time that elapsed between the complaint and Ball's failure to obtain the bartender position as beginning on September 18, 2017 or October 17, 2017—over ten months or over nine months, the result is the same because either period of time is too long to support a *prima facie* showing that there was a causal connection between the complaint and the allegedly retaliatory action.

While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal . . . right and an allegedly retaliatory action," *Summa*, 708 F.3d at 128 (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)), more than nine months is too long a time to establish this causal relationship.  *See, e.g.*, *Beharry v. City of New York*, 2019 WL 634652, at *4 (S.D.N.Y. Feb. 14, 2019) (Nathan, J.); *Forest v. N.Y.S. Office of Mental Health*, 2015 WL 6965149, at *8 (S.D.N.Y. Nov. 10, 2015); *Jiminez*, 605 F. Supp. 2d at 528; *Uddin v. City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006); *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 268–69 (S.D.N.Y. 2003).  Ball thus cannot rely on temporal proximity to establish the requisite causal connection between her complaint and the allegedly retaliatory action.

Ball argues that she can also establish a causal connection "through the pretextual nature of the actions taken against" her.  Dkt. No. 70 at 18.  This argument appears to conflate the

---

[8] Ball agrees that Tapia was hired on July 26, 2018, Dkt. No. 68 ¶ 120, but she asserts in her opposition brief that Marriott "passed [Ball] over for the bartender position" in May, Dkt. No. 70 at 18.  Ball had not even interviewed for the bartender position in May, *id.* ¶ 111, nor had she taken the written test, *id.* ¶ 114, both events which occurred in June of 2018.  The Court uses the date for Tapia's hiring that is agreed to by the parties.

causation inquiry in the *prima facie* analysis with the burden on a plaintiff to show that a defendant's proffered reason for taking the action it did was merely pretextual, which only comes into play once a *prima facie* case has been made.[9]  In any event, even assuming Ball was able to show the requisite causal connection with the evidence in the record, the facts would not permit a rational trier of fact to find that Marriott did not proffer a legitimate, non-retaliatory reason for Ball not receiving the bartender position or that Marriott's proffered reason for hiring Tapia was pretextual.  Ball did not properly dispute—and thus admitted—that the relevant decision-makers in June 2018 decided to create a written test and that whichever candidate scored highest on the written test would be offered the job.  Dkt. No. 68 ¶ 113; *see also supra* n. 4.  Tapia received the highest score on the test, scoring one point higher than Ball did.  Dkt. No. 68 ¶¶ 115–116.  Marriott has thus proffered a legitimate, non-discriminatory reason for hiring Tapia over Ball—Tapia scored higher on the written test that the decision-makers agreed would inform their hiring.

Once an employer "has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.,* 760 F.3d 223, 225 (2d Cir. 2014) (alterations in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  There is no such evidence here.  While Ball argues that she was impermissibly docked a point on the test for a correct answer and that

---

[9] To the extent Ball is arguing that the "pretextual nature of the actions taken against her" give rise to an inference of discriminatory intent to fulfill the "causal connection" prong of a *prima facie* case, the Court is unpersuaded for the same reasons described *infra*—namely, that there is no evidence that the actions taken were pretextual.

she otherwise would have gotten the same score as Tapia, no reasonable juror could find that this renders Marriott's action in hiring Tapia pretextual.  Ball did not just select a correct answer for which other individuals received credit and she did not—Ball declined to circle one of the answers that was provided in the multiple-choice test and instead wrote an answer in.  *See* Dkt. No. 63-2 at 5.  The failure to give her credit for that answer—an answer that failed to respond to which of the multiple-choice answers best responds to the question—cannot reasonably be thought to be evidence of pretextual behavior.  Nor can the difference in experience that Ball points to render the decision pretextual in these circumstances.  An "employee may create a fact issue as to the honesty of the proffered reasons on the basis of her alleged superior job qualification, but to do so, she must show that her credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the [plaintiff] for the job in question' . . . or that the defendant 'disregard[ed] or misjudge[ed] . . . plaintiff's job qualifications.'"  *Garcia v. Regan*, 2022 WL 912234, at *10 (S.D.N.Y. Mar. 28, 2022) (quoting *Abraham v. New York City Dept. of Educ.*, 398 F. App'x 633, 635 (2d Cir. 2010) (summary order); and then quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)); *see also Turner v. NYU Hosps. Ctr.*, 470 F. App'x 20, 24 (2d Cir. 2012) (summary order) ("[T]o defeat summary judgment on the ground or pretext or that retaliation was a substantial reason for [plaintiff's] termination, [plaintiff] had to adduce evidence that his qualifications were so superior . . . . that no reasonable person, in the exercise of impartial judgment, could have choosing [the person picked for the job] over the plaintiff for the job in question." (internal quotation marks omitted)); *Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 26 (2d Cir. 2021) (summary order) (same).  Ball has adduced no such evidence here, particularly where, despite the asserted

differences in qualifications, Tapia received a 27/30 on an examination intended to measure qualifications for the position.

Because a reasonable trier of fact could not find that there was a causal connection between Ball's complaint and her non-hiring for the bartender position, Marriott is entitled to summary judgment on Ball's retaliation claim.  Even if Ball could, however, show the requisite causal connection, Marriott would be entitled to summary judgment because the evidence cannot support a showing of pretext.

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 59 and 60 and to close the case.


SO ORDERED.

Dated: September 12, 2022
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge